BOSTON GAS COMPANY *vs.* DEPARTMENT OF PUBLIC
UTILITIES.

Suffolk.   November 8, 1974. — March 4, 1975.

Present: QUIRICO, BRAUCHER, KAPLAN, & WILKINS, JJ.

*Gas Company.   Public Utilities.   Equity Jurisdiction,* Public utilities.
*Equity Pleading and Practice,* Review of order of department of
public utilities.   *Constitutional Law,* Public utilities.

Where the Department of Public Utilities had approved a utility
company's plan to retire an outmoded oil gas manufacturing
plant and amortize the then remaining undepreciated investment
in the plant over a period of ten years, and, during the first four
years of the period, the department had approved the inclusion of
unamortized retired plant in the company's rate base, it was
improper for the department to exclude the retired plant from the
rate base for the remaining six years without finding or reporting
facts warranting such a change [100-104]; the department's exclu-
sion order must be vacated and the case remanded to it for further
proceedings [105].

Two PETITIONS filed in the Supreme Judicial Court for
the county of Suffolk on September 28, 1973, and
November 7, 1973, respectively.

The cases were reserved and reported by *Reardon,* J.

The cases were submitted on briefs.

*Hans F. Loeser, Verne W. Vance, Jr., & Scott C.
Moriearty* for Boston Gas Company.

*Robert H. Quinn,* Attorney General, *Walter H.
Mayo, III,* Assistant Attorney General, *& David M.
O'Connor,* Legal Assistant to the Attorney General, for
the Department of Public Utilities.

QUIRICO, J.   These are consolidated appeals taken by
the Boston Gas Company (Company) under G. L. c. 25,
§ 5, as amended by St. 1971, c. 485.   One appeal is from
the decision, order and rulings of the Department of

Public Utilities (Department) dated June 29, 1973, and the other is from the decision, order and rulings of the Department dated October 10, 1973. Both orders relate to schedules for increased rates and charges filed by the Company with the Department on August 16, 1972, to take effect on September 1, 1972, but suspended by the Department until July 1, 1973, pursuant to G. L. c. 164, § 94.

The appeals were entered in the Supreme Judicial Court for Suffolk County. Thereafter, at the request of the parties, a single justice of the court ordered the appeals consolidated and reserved and reported them, without decision, to the full court "for such decree to be entered as may be appropriate under G. L. c. 25, § 5."

The schedules of rates and charges filed by the Company on August 16, 1972, would have produced about $7,900,000 of additional revenues annually. The Department's order of June 29, 1973, disallowed those schedules and instead authorized the Company to file new schedules which would produce additional gross revenues of $3,881,764. On motion of the Company and certain interveners the Department reconsidered five matters which formed part of the basis for its order of June 29, 1973. The reconsideration resulted in the Department's order of October 10, 1973, which, inter alia, authorized the Company to file new schedules which would produce additional gross revenues of $656,344 over and above the $3,881,764 previously authorized.[1]

Of the many issues raised by the Company's appeals, only one has been briefed by the Company as "significant enough to warrant the attention of this Court."

---

[1] This order also authorized a surcharge to produce an additional sum of $3,482,451 to cover a forty-eight per cent increase in the Company's municipal real estate and personal property taxes in 1973 over the taxes for 1972, subject to adjustment if the Company prevailed in its challenge of the taxes. This item does not affect our decision in these appeals.

The other issues either were resolved to the Company's satisfaction by the Department's second order or have been waived. The only issue requiring our decision is whether the Department properly excluded from the Company's test year rate base an item of $1,908,941 representing the net amount of unamortized retired plant.[2]

The item of "unamortized retired plant" derives almost entirely from the Company's abandonment in 1969 of its oil gas manufacturing plant and related facilities located at Everett and Commercial Point in Boston. In 1970, the Department authorized the Company to amortize the then remaining undepreciated investment in the plant and facilities as an expense item spread over a ten year period, thus permitting the Company, in effect, to recoup that investment. At issue here is whether the Company is entitled to more than that — specifically, whether it is entitled to have the unamortized balance of that investment included in its rate base and thus further entitled to have included in its test year expenses an allowance for the cost of the capital invested in that plant. The Department decided that it is not. We hold, for reasons peculiar to this case and which we discuss below, that it is.

The question whether this unamortized investment in gas manufacturing plant and facilities is properly includable in the Company's rate base was considered by this court, in a different form, in *Boston Gas Co.* v. *Department of Pub. Util.* 359 Mass. 292 (1971) (hereinafter referred to as the 1971 opinion). We describe the background of the present controversy, much of which is also revealed in the 1971 opinion. See 359 Mass. at 295, 308-309, 311-316 (1971).

---

[2] For test year purposes, this amount was arrived at by averaging the unamortized retired plant balance on January 1, 1972, and that of December 31, 1972. The computation is: $2,064,326 plus $1,753,556 equals $3,817,882 which, divided by two, is $1,908,941.

The Company (including several other companies to which it has from time to time succeeded by merger or otherwise) has been engaged in the gas business since the middle of the Nineteenth Century.[3]  For the first century of its existence the Company manufactured all of the gas which it distributed and sold.  When the Algonquin Gas Transmission Company natural gas pipeline was completed and started bringing gas to the New England area in the early or mid 1950's, the Company converted its operations, its equipment, distribution system and customer appliances to permit the use of natural gas with resulting reduction in its gas manufacturing operations. By 1968 about ninety-eight per cent of the gas sold by the Company was natural gas obtained from the pipeline company, and only the remaining two per cent was manufactured by it.

The rates at which the pipeline company sold natural gas to the Company included a "demand charge" computed in part on the basis of the greatest quantity of gas taken by the Company from the pipeline in any single day in the preceding year, this day being sometimes called the "peak day."  In the case of a gas company serving a substantial number of customers heating buildings with gas, the peak day often occurs sometime in the coldest winter months.  In effect, a gas company whose daily take of natural gas from the pipeline fluctuates widely pays a higher rate for the gas than would a company with a substantially uniform daily take.  It is therefore in the interest of a gas company and its customers that those extreme fluctuations in the daily take from the pipeline be avoided or minimized.  One of the common ways of doing this is by resort to "peak-

---

[3] For the origin and development of legislative franchises to manufacture and sell gas in the area now included in the city of Boston, see St. 1846, c. 36 and c. 98; St. 1848, c. 20; St. 1850, c. 202; St. 1852, c. 103 and c. 198; St. 1853, c. 13, c. 29, c. 63 and c. 320; St. 1854, c. 9 and c. 321.

shaving" operations. Basically, peak-shaving consists of the use of gas from a source other than the pipeline to avoid or level the uneven peak demands on the pipeline. See Phillips, The Economics of Regulation, 642-647 (1965).

For the years prior to and for part of the year 1968 the Company accomplished peak-shaving by the use of gas which it manufactured in its own plant maintained on a standby status for that purpose. In late 1968, however, the Company put into operation a new liquefied natural gas (LNG) facility intended to replace, in the near future, the obsolescent manufactured gas plant as a peak-shaving device. Because the full cost of the manufactured gas plant had not been amortized or depreciated by the time it was retired from use and replaced by the new LNG facility, the question arose as to the proper treatment for rate purposes of the retired plant. This question was complicated in the 1971 opinion by the fact that it developed in the context of a comparison by the Department of the Company's financial situation in two hypothetical test years, one a year in which only LNG was used for peak-shaving and the other a year in which no LNG was used for that purpose. We said, at 314-315: "Company contends that, in computing the savings to be expected in an all-LNG hypothetical test year, the D.P.U. did not include (for purposes of comparison with the hypothetical no-LNG year) any return on the $3,794,000 of Company's investment in manufactured gas facilities which had not been amortized (or depreciated) by the beginning of 1968. It would seem that this item (i.e. carrying any unamortized balance of a prudent investment in an obsolete facility after it has been supplanted by a modern facility) would be proper for consideration in some manner in comparing the results of a hypothetical all-LNG year with those of a hypothetical no-LNG year. Precisely what the D.P.U. has done with this item in its comparison is not clear from its decision or from the D.P.U.'s brief. The computation and comparison must

be reexamined, and any discrepancy appropriately corrected, with a clear explanation of the relevant steps in the comparison."

The Department concedes that on remand of the case following our 1971 opinion it permitted the Company to include the value of its unamortized retired plant in its rate base. *Re Boston Gas Co.*, D. P. U. 16102-B at 4-5 (June 30, 1971). In the next two rate proceedings involving the Company, the Department again permitted the inclusion of the unamortized retired plant in the rate base. *Re Boston Gas Co.*, D. P. U. 16515 at 9 (June 21, 1971). *Re Boston Gas Co.*, D. P. U. 17330 at 4 (July 12, 1972). Not until the present proceeding did the Department change its position and for the first time exclude this property from the Company's rate base. *Re Boston Gas Co.*, D. P. U. 17461 at 7-9 (June 29, 1973 — the rate order). *Re Boston Gas Co.*, D. P. U. 17461-A at 1-2 (October 10, 1973 — the supplemental rate order).

The Company argues that the 1971 opinion is dispositive of the issue in this case. We disagree. As the language previously quoted from that opinion manifests, the record then before us was unclear as to how the Department had treated this item. Our decision merely required that on remand the Department "consider" the retired plant in its comparison of the hypothetical all-LNG and no-LNG test years and that it make clear its treatment of this item. The quoted language was obviously not meant as a final determination whether the retired plant should be included in the Company's rate base.

The Company further argues that this item must be included in its rate base "as a matter of law and sound public policy." There is a long accepted and often repeated principle that a regulated public utility such as the Company is entitled to charge rates which afford it the opportunity to meet its cost of service, including a fair and reasonable return on honestly and prudently invested capital, but the application of the principle is

often difficult. *Lowell Gas Co.* v. *Department of Pub. Util.* 324 Mass. 80, 94-96 (1949). *New England Tel. & Tel. Co.* v. *Department of Pub. Util.* 360 Mass. 443, 450 (1971). The amount of investment on which the Company is entitled to an opportunity to earn a fair and reasonable return is its rate base. *New England Tel. & Tel. Co.* v. *Department of Pub. Util., supra,* at 450. If an item were improperly excluded from the rate base, the rates set pursuant to that improper reduction of the rate base would deny a return on that item and, to that extent, could be confiscatory and unlawful. While the foregoing rule guides us in our examination of these appeals, we also adhere to the principle that our fundamental law requires no particular theory or method to be used in determining a rate base, provided the resulting rates are not confiscatory. Accordingly, we will not lightly set aside supportable determinations made by the Department in this area. See *New England Tel. & Tel. Co.* v. *Department of Pub. Util., supra,* at 453, citing *New England Tel. & Tel. Co.* v. *Department of Pub. Util.* 331 Mass. 604, 616 (1954), and *St. Joseph Stock Yards Co.* v. *United States,* 298 U. S. 38, 53 (1936).

The Company contends that because the Department concedes both that the original investment in the now retired plant was prudent and that the 1969 replacement of this plant by LNG facilities was also sound, the Department is therefore compelled to allow the Company a full rate of return on the unamortized portion of the retired plant. The Company argues for its contention on the basis of policy considerations which follow. Investors in public utility companies have a legitimate expectation of a reasonable return on their investment, and to deny a company the opportunity to earn on an investment because of the retirement of a part of its plant will adversely affect the company's ability to raise capital or financing needed to replace the retired plant or otherwise to serve its customers. This in turn might compel or influence a company to continue to use outmoded plant

or, if the plant is replaced, to attempt to retain it on a standby basis since standby facilities are generally includable in a rate base. See *Re Pittsfield Coal Gas Co.* 3 P. U. R. 3d 1, 4 (Mass. D. P. U. 1954); Priest, Principles of Public Utility Regulation, 175-178 (1969). Either alternative, it is argued, would adversely affect the utility customers, one resulting in poor service from the use of outmoded facilities, and the other requiring the customers to pay rates which will provide a return on unused and outmoded facilities labeled as standby solely to accomplish the latter result.

We reject any thought that a utility company can compel the Department to allow it to earn on obsolete plant by merely engaging in the fiction of labeling it as standby plant. The Department is not precluded from disregarding the fiction and determining the fact. Plant claimed to be kept available for use on a standby basis is includable in the rate base only where there appears to exist some contingency on the occurrence of which the use of that plant would be necessary. See, e.g., *Re Pittsfield Coal Gas Co.* 3 P. U. R. 3d 1, 4-5 (Mass. D. P. U. 1954). See, generally, Priest, Principles of Public Utility Regulation, 175 (1969).

We similarly reject any thought that the exclusion of retired plant from the rate base could or would have dissuaded any gas company from converting to natural gas when it first became available, or from later replacing its peak-shaving gas manufacturing facilities with LNG peak-shaving equipment. That the changes were dictated by the basic economics of the situation has been amply demonstrated by historical developments in the gas industry in the approximately twenty years since natural gas pipe lines reached the New England States. The gas industry was in no position to stand still in the face of such physical and technological developments. Its customers, its investors and the regulatory authorities would not have condoned, accepted or permitted

inaction; nor could the Company afford it in the face of the competition from other energy suppliers.

In its decision and order of June 29, 1973, the Department gave no reasons for its exclusion of the unamortized retired gas manufacturing plant from the Company's rate base beyond the following statement: "Generally, we have questioned the inclusion of unamortized abandoned property in the rate base. Re: *Brockton Taunton Gas Co. D.P.U.* 16981 . . .. Net unamortized retired plant is not a proper item for inclusion in the rate base in this case." However, in its brief before this court the Department has advanced several arguments in support of its action and we now consider them.

One argument of the Department is that the Company's failure to recover all of the costs of the gas manufacturing plant before it was retired "indicates a miscalculation by the Company of the useful life of the facility [and that h]ad the Company calculated the useful life correctly, the cost of the facility would have been completely amortized, and there would be no unamortized portion to include in the rate base after the facility had been retired." It is questionable whether this argument by or in behalf of the Department is fair or proper in the circumstances of this case.

The Department's decision and order of June 20, 1973, which is the subject of these appeals states in part that the gas manufacturing plant and related facilities abandoned in 1969 were "to be amortized over a ten year period commencing in 1970, *as authorized by the Department on January 22, 1970*" (emphasis supplied). It also appears that in at least three later decisions and orders relating to the Company the Department either expressly or impliedly permitted or recognized without disapproval the inclusion of the unamortized balance of the retired plant in the rate base. *Re Boston Gas Co.,* D. P. U. 16102-B at 4-5 (June 30, 1971). *Re Boston Gas Co.,* D. P. U. 16515 at 9 (June 21, 1971). *Re Boston Gas Co.,* D. P. U. 17330 at 4 (July 12, 1972).

It is undisputed that the Department has the authority, and perhaps the duty, to inquire into the appropriateness of a utility company's depreciation practices and reserves, particularly as they may bear on the company's rate base, rate of return and ultimate charges to its customers. This subject was discussed in detail in our opinion in *Wannacomet Water Co. v. Department of Pub. Util.* 346 Mass. 453, 458-465 (1963). In the present case the Department has made no finding or ruling that the Company's schedule for depreciating the retired plant over ten years was erroneous or inappropriate in any manner, or that the Company had in any way miscalculated the useful life of the facility, as the Department's counsel is now claiming. We have before us a record which shows only that the Company is amortizing the facility in accordance with a plan approved by the Department. In these circumstances, the argument of "miscalculation," advanced more than four years after the Department's approval of the Company's action, comes more than four years too late.

Perhaps the Department's strongest argument for the exclusion of the unamortized retired plant in the Company's rate base is found in the principle that a utility is not entitled to a return on an investment in property which is not "used or useful" in providing service to customers. It is sometimes said that the question whether property is used or useful in rendering service to the public "is the first test applied to a utility's plant account when rate base is determined." Priest, Principles of Public Utility Regulation, 174 (1969). The Department urges that we treat the retired plant in question the same as we do utility plant under construction. We have generally permitted the exclusion of plant under construction from the rate base as not used or useful, at least where the cost of the capital going into the construction is treated as a cost of service until the particular item of plant goes into operation. See, e.g., *New England Tel. & Tel. Co. v. Department of Pub. Util.* 360

Mass. 443, 454-458 (1971). The exclusion of plant under construction from the rate base is not truly apposite to this case, however, since it merely defers the start of earnings on that investment, whereas the exclusion of unamortized retired plant would permanently preclude earnings on that investment.

We have reviewed the opposing views of the Company and the Department and the contention of each has some merit. Each is supportable by decisions of regulatory agencies outside of Massachusetts having powers comparable to those of the Department.[4]

In *New England Tel. & Tel. Co.* v. *Department of Pub. Util.* 360 Mass. 443, 456 (1971), we said: "[T]here is no constitutional requirement that the Department use a year-end rather than an average test year rate base, [and] there is likewise no constitutional requirement that the Department, in the exercise of its rate-making power, should or should not include plant under construction in computing the Company's rate base. This Court is not justified in overruling the action of the Department merely because it used one approach rather than another in this regard." That language applies equally to the question whether unamortized retired plant should be

---

[4] Decisions permitting a rate of return on abandoned unamortized gas plant in circumstances similar to those of this case include: *Re Consolidated Edison Co. of N. Y. Inc.* 56 P. U. R. 3d 337, 371-377 (N. Y. Pub. Serv. Commn. 1964) (allowing a "carrying charge" of less than the composite rate of return); *Re Brooklyn Union Gas. Co.* 100 P. U. R. 3d 345, 350-351 (N. Y. Pub. Serv. Commn. 1973) (allowing the full composite rate of return by including the abandoned property in the rate base).

Decisions which deny a rate of return on abandoned unamortized gas plant include: *Washington Pub. Serv. Commn.* v. *Northwest Natural Gas Co.* 32 P. U. R. 3d 355, 359-360 (Wash. Pub. Serv. Commn. 1960); *Re Public Serv. Co. of N. C. Inc.* 33 P. U. R. 3d 398, 404 (N. C. Util. Commn. 1960); *Re Michigan Consol. Gas Co.* 36 P. U. R. 3d 289, 295-296 (Mich. Pub. Serv. Commn. 1960); *Re Jacksonville Gas Corp.* 40 P. U. R. 3d 372, 374-375 (Fla. R.R. and Pub. Util. Commn. 1961); *Re Greater Winnipeg Gas Co.* 62 P. U. R. 3d 213, 224 (Manitoba Pub. Util. Bd. 1965).

included or excluded in determining the Company's rate base. If, historically, the Department had elected to apply the rule of exclusion to such cases and had applied that rule uniformly and consistently, this court would probably defer to that judgment, absent confiscation of property of the Company or investors, and absent special circumstances compelling a contrary conclusion.

We note, however, as illustrated in the margin, that the Department has not consistently applied a rule of inclusion or of exclusion of unamortized retired plant when determining the rate base in its recent decisions.[5] The Department concedes this by the following statement in its brief: "The orders of the Department are clearly inconsistent, but it is the orders entered which allowed the value of unamortized retired plant in the rate base which represent an aberration from the Department's policy of excluding that item. It is the Department's attempt to treat unamortized retired plant in a manner which is consistent and uniform throughout the Commonwealth which has met the resistance of the Boston Gas Co." We do not feel compelled to decide which of the Depart-

[5]

| Date of Decision | No. of Decision | Name of Company | Decision |
|---|---|---|---|
| 1-8-70 | 16102 | Boston Gas Co. | Excluded* |
| 7-28-70 | 16316 | Worcester Gas Light Co. | Excluded |
| 6-21-71 | 16515 | Boston Gas Co. | Included |
| 6-30-71 | 16102-B | Boston Gas Co. | Included* |
| 1-12-72 | 16981 | Brockton Taunton Gas Co. | Excluded |
| 7-12-72 | 17330 | Boston Gas Co. | Included |
| 6-29-73 | 17461 | Boston Gas Co. | Excluded** |
| 10-10-73 | 17461-A | Boston Gas Co. | Excluded** |
| 12-12-73 | 17750 | Brockton Taunton Gas Co. | Excluded |

*Decision No. 16102 was the subject of the appeal in our 1971 opinion, and Decision No. 16102-B followed on our 1971 opinion.

**Decisions Nos. 17461 and 17461-A are the subject of the present appeals. In No. 17461-A the Department chose not to alter its order in No. 17461 excluding unamortized retired plant from the Company's rate base.

ment's decisions represent a uniform and consistent pattern and which represent an aberration. Ultimately it will be the responsibility of the Department to do that. However, we do feel compelled to decide that, where the Department originally approved of the Company's plan to retire its gas manufacturing plant and amortize it over a period of ten years, and where, during the first four years of that period, the Department on three different occasions approved of the inclusion of that retired plant in the Company's rate base, it may not exclude the retired plant from the rate base for the remaining six-year period of amortization without finding or reporting some facts which would warrant or permit such a change.

Whatever rule the Department may ultimately choose to follow on the question whether unamortized retired plant is to be included in the rate base, it should apply the same rule consistently to all utility companies subject to its regulatory authority. However, if, after claiming to have adopted a rule excluding such plant from the rate base, the Department knowingly and intentionally includes such plant of a particular company in its rate base, that company should not thereafter be subject to erratic changes in treatment every time the inclusion or exclusion of that item of plant may affect rate action sought by the company. A party to a proceeding before a regulatory agency such as the Department has a right to expect and obtain reasoned consistency in the agency's decisions. This does not mean that every decision of the Department in a particular proceeding becomes irreversible in the manner of judicial decisions constituting res judicata, but neither does it mean that the same issue arising as to the same party is subject to decision according to the whim or caprice of the Department every time it is presented. Davis, Administrative Law Treatise, §§ 17.01, 17.07, 18.01, and 18.02 (1958 and 1970 Supplement).

The Department has failed to comply with G. L. c. 30A, § 11 (8), inserted by St. 1954, c. 681, § 1, re-

quiring that its decision excluding the Company's unamortized retired plant from its rate base "be accompanied by a statement of reasons for the decision, including determination of each issue of fact or law necessary to the decision." In view of the Department's prior pattern of treatment of this item, an unexplained deviation from that pattern cannot be permitted. Therefore, pursuant to G. L. c. 30A, § 14 (8) (f) and (g), the case is remanded to the county court. An order is to be entered there vacating the decisions and orders of the Department in so far as they exclude the item of the Company's unamortized retired gas manufacturing plant from its rate base and remanding the case to the Department for further proceedings consistent with this opinion. If the Department thereafter elects to make a statement of its reasons for excluding this item, it shall file the statement in the county court on or before April 1, 1975, and it shall include therein a statement of the proceedings which led to the inclusion of the comparable item in the Company's rate base in the three earlier cases, Nos. 16102-B, 16515 and 17330, and a statement of its reasons for such inclusion.

*So ordered.*