BOSTON GAS COMPANY vs. DEPARTMENT OF
PUBLIC UTILITIES.

Suffolk.   May 8, 1975. — October 29, 1975.

Present: TAURO, C.J., REARDON, QUIRICO, KAPLAN, & WILKINS, JJ.

*Gas Company.   Public Utilities.   Jurisdiction, Civil,* Public utilities.
*Practice, Civil,* Review of order of department of public utilities.
*Constitutional Law,* Due process of law, Public utilities.

A party to an agreement who intervened in a proceeding before the
   Department of Public Utilities solely on the issue of increased
   interim rates sought by a gas company and the impact of the
   agreement on such rates, which the department allowed subject to
   refund if found excessive upon its determination of permanent
   rates, was entitled to appeal under G. L. c. 25, § 5, from the
   department's final order respecting permanent rates, which im-
   plicitly indorsed its ruling on the agreement when it made its
   decision on the interim rates.   [785-786]
An agreement by the Boston Gas Company with interveners in a
   proceeding to obtain approval by the Securities and Exchange
   Commission of the company's prior agreement to acquire three
   North Shore gas companies, that the company would not initiate
   before a specified date rate proceedings which would equalize or
   increase rate differentials between the area formerly served by
   the North Shore companies, the Northern Division, and the com-
   pany's then existing service area, the Boston Division, did not
   apply to rate increases initiated by the North Shore companies by
   filing schedules of proposed new rates with the Department of
   Public Utilities prior to the effective date of the acquisition; upon
   acquisition the company simply acquired the interest of the North
   Shore companies in their rate schedules.   [783-788]
With respect to rates to be charged by a gas company, based on a test
   year considerably warmer than normal, a decision by the Depart-

ment of Public Utilities in its final order to "apply the measure-
ment of a normal degree day year," rather than to ignore weather
adjustments, or to determine a range of weather normality, and
then only adjust for weather that fell outside of that range, did
not result in confiscatory rates [783-791]; nor did the company
demonstrate that the department's previous case-by-case treatment
of the weather adjustment issue rendered its decision in the case at
bar arbitrary, capricious or an abuse of discretion [791-798].
Following an agreement by the Boston Gas Company to acquire three
North Shore gas companies and the filing by the North Shore
companies of schedules of proposed rates for their respective
service areas, and the filing by the Boston Gas Company of sched-
ules of proposed rates for its then existing service area, on which
was located a new substitute natural gas plant manufacturing
propane gas which was ready for operation in the last month of
the test year, a determination by the Department of Public Utili-
ties, after merger of the four companies, establishment of the
North Shore areas as the Northern Division and the fourth area as
the Boston Division, and consolidation of the four rate proceedings,
that 36.5% of the new plant and such percentage of the real estate
taxes thereon should be allocated to the Northern Division, with-
out any corresponding increase in the Northern Division rates, did
not exceed the department's authority where it appeared that
approximately 36.5% of the new plant's production served the
Northern Division and that the rate schedules filed for that division
were approved in full.   [798-800]
A statement of reasons by the Department of Public Utilities in a rate
proceeding for excluding the unamortized cost of a retired oil gas
manufacturing plant from the rate base of a gas company, fur-
nished following the decision of this court in *Boston Gas Co.* v.
*Department of Pub. Util., ante,* 51 (1975), did not justify a change
from the department's determination in three prior rate pro-
ceedings to include the company's unamortized retired plant in its
rate base [800-802]; the department's order of exclusion must be
vacated [804-805].
The Department of Public Utilities did not exceed its statutory au-
thority in a rate proceeding respecting a gas company in conclud-
ing that a return of 12.6% on the cost of its equity capital was
adequate and would "provide an appropriate allowance for [any]
attrition," rather than adopting the testimony of the only witness
on the issue that a fair return on the company's common equity
was no less than 13%, where the department gave some weight
to his testimony and he discounted his own conclusions [803-804];
the company did not show that its loss in annual revenue from
adoption of the department's position would result in confiscation
[804].

Under G. L. c. 25, § 5, a "party" to a· proceeding before the Department of Public Utilities must be "aggrieved" by its decision, order or ruling in order to appeal to this court.  [805]

In a rate proceeding respecting a gas company, the Department of Public Utilities did not abuse its discretion in accepting the company's judgment on certain of its sales expenses or in accepting testimony of a company witness concerning the computation of a weather adjustment.  [805]

In a rate proceeding respecting a public utility, the Department of Public Utilities did not err in denying the motion of a party to the proceeding for counsel fees and expenses.  [805-806]

THREE PETITIONS filed in the Supreme Judicial Court for the county of Suffolk on January 8, January 13, and January 21, 1975, respectively.

The cases were reserved and reported by *Kaplan, J.*

*Andrew J. Newman* for Michael J. Harrington.

*Stanley U. Robinson, III,* pro se.

*Hans F. Loeser & James K. Brown* for Boston Gas Company.

*Paul K. Connolly,* Special Assistant Attorney General, & *Michael Eby,* Assistant Attorney General, for the Department of Public Utilities.

WILKINS, J.   On December 13, 1974, after an extended hearing, the Department of Public Utilities (department) entered an order concerning rate schedules of the Boston Gas Company (company).   Harrington and Robinson, who were interveners before the department, have appealed from that order[1] (see G. L. c. 25, § 5), contending that it is more favorable to the company than it should be.   The company also has appealed, expressing dissatisfaction because the department rejected a portion of the rate increases reflected in the filed rate schedules.

---

[1] The appeals are by Michael J. Harrington (Harrington) and by Stanley U. Robinson, Third (Robinson), from the same final decision of the department from which the company appeals, and Robinson also appeals from the department's interlocutory order allowing the company certain interim rate increases pending final determination of this matter.   We also have before us for consideration the company's challenge to the department's response following our order in *Boston Gas Co.* v. *Department of Pub. Util.* 367 Mass. 92 (1975).

A single justice of this court consolidated the various cases for appeal to the full court and has reserved and reported them for decision. We turn first to Harrington's appeal, the consideration of which will explain his and Robinson's interest in the proceedings and will provide necessary background for an understanding of the company's appeal.

THE HARRINGTON APPEAL.

Harrington challenges the department's interpretation of an agreement concerning rates made between the company and others, including Harrington, in connection with certain proceedings before the Securities and Exchange Commission (S.E.C.). That agreement, which dealt also with subjects other than rates, was executed in August, 1973, and has been described in these proceedings as the S.E.C. agreement.

In 1964, the S.E.C. ordered the New England Electric System (NEES) to divest itself of its gas subsidiaries. *Matter of New England Elec. Sys.* 41 S. E. C. 888 (1964), affd. sub nom. *Securities & Exch. Commn.* v., *New England Elec. Sys.* 390 U. S. 207 (1968). In 1973, the company entered into an agreement with three subsidiary gas companies of NEES to purchase all their assets and assume all their liabilities. These companies were the Lynn Gas Company, the Mystic Valley Gas Company, and the North Shore Gas Company (the North Shore companies). The area served by these three companies now is known as the company's Northern Division. As a condition of the sale, the department's approval was required, and, on March 1, 1973, the department gave approval subject to further approval by the S.E.C. NEES already had filed a request for S.E.C. approval. Harrington and others intervened in the S.E.C. proceeding. The company (and its parent company) entered into the S.E.C. agreement with the

interveners in exchange for the interveners' promise not to oppose further the company's request for S.E.C. approval of the acquisition. The S.E.C. gave approval in October, 1973, and the acquisition was completed as of December 20, 1973.

The interveners before the S.E.C. were concerned that rates to consumers in the Northern Division not be affected adversely by the change — in particular, that rate differentials favoring Northern Division consumers not be eliminated. Consequently, the S.E.C. agreement, among other things, purported to restrict certain rate increases before September 1, 1977, which would reduce or eliminate rate differentials between the Northern Division and the company's existing service area, the area now known as the company's Boston Division.

On September 17, 1973, each of the North Shore companies filed schedules of proposed new rates, totaling an annual increase of approximately $2,700,000. On December 17, 1973, three days before the effective date of the acquisition, the company filed proposed new schedules involving an estimated increase of about $6,600,000 in annual revenues for its then existing service area. The department suspended the effective date of each of these rate filings for ten months pursuant to G. L. c. 164, § 94. These suspensions were extended by agreement of the company until the date of the final rate order. On January 9, 1974, on its own motion, the department merged the three Northern Division rate proceedings and the Boston Division proceeding.

On February 4, 1974, the company filed a motion to be allowed to put into effect $6,200,000 of the proposed permanent $9,300,000 increase in annual revenues provided in the schedules then subject to suspension. The rate increase sought on an interim basis for the Boston Division was approximately 3.7%. The interim increase requested for the Northern Division was for the full amount of the rates filed by the North Shore companies, representing an increase of approximately 6.7%. The

department called a public hearing on the company's motion for immediate rate relief. Harrington petitioned for leave to intervene "in opposition . . . [to] the Boston Gas Company's petition for interim relief," specifically "with respect to the interim relief requested for the companies forming the Northern Division." The petition alleged discrimination and violation of the S.E.C. agreement. Intervention was allowed, but, for reasons which will be considered below, the department rejected Harrington's arguments concerning the S.E.C. agreement and granted the requested interim rate relief, subject to refund, if on final determination the increased revenues were excessive.

Before reaching the issue of the effect, if any, of the S.E.C. agreement on the rates approved for the Northern Division, two procedural questions should be considered. When the department held hearings on the permanent rate schedules, following its decision on the interim rates, it gave Harrington no notice of those continued proceedings. He objects to that omission, although he does not argue explicitly that it invalidates the final decision. He does not assert that he was unaware of the continued proceedings or indicate what further he would have offered in evidence or as argument concerning the S.E.C. agreement. In fact, in the continued proceedings the department gave no further attention to the S.E.C. agreement, except to refuse to admit extrinsic evidence offered by Robinson on the meaning of that agreement. In any event, Harrington's motion to intervene was related solely to the issue of the interim rates and the S.E.C. agreement's impact on those interim rates. If he had wished to intervene more broadly, he should have so requested.

The company argues that Harrington lacks standing to appeal from the final order in this proceeding because his intervention was limited to the proceeding involving the allowance of interim rates. Appeals are permitted under G. L. c. 25, § 5, only from a final decision, order or

ruling.   The department's decision on interim rate relief was not final because it made the interim rates subject to revision when the final order was made.   A statutory appeal could have been taken only from the final order. See *Boston Gas Co. v. Department of Pub. Util., ante,* 51, 54, 56 (1975).   There is no question that the department's final order concerning permanent rates implicitly indorsed the ruling on the S.E.C. agreement which it had made at the time of its decision on the interim rates.   Harrington's challenge to the department's decision concerning the S.E.C. agreement is properly here because he is an interested party aggrieved by the department's final decision.[2]

We come then to the terms of the S.E.C. agreement and the question of its application, if any, to the rates approved by the department in its final order.   In part I paragraph 1 (paragraph 1) of the agreement, the company agreed not to "initiate or support any proceeding that would accomplish . . . [rate] equalization [between the two divisions] prior to September 1, 1977." In part I paragraph 2 (paragraph 2), the company agreed further that "if after acquisition of the North Shore Companies Boston Gas should find it necessary to initiate any rate increases for territories now served by the North Shore Companies which would go into effect prior to September 1, 1977, such rate increases shall not result in a greater percentage increase in revenues from the territories now served by the North Shore Companies than from the present Boston Gas territory."   The department concluded in its interim rate decision that it could not be bound by the S.E.C. agreement.   It added that the agreement had no application to the matter before it because the S.E.C. agreement applied only to rate filings

---

[2] In any event, Harrington's standing to appeal is not an essential precondition to our consideration of the effect, if any, of the S.E.C. agreement, because Robinson, whose appeal is clearly here on this issue, raises the same points.

made subsequent to the acquisition of the Northern Division.

Harrington argues that the department must honor the provisions of the S.E.C. agreement as a private rate contract, unless the department finds that the contract is unreasonable. He recognizes that under G. L. c. 164, § 94, the department may enter an order "as the public interest requires" with respect to any contract for the sale of gas, but he contends that the department has not determined that the public interest requires that the S.E.C. agreement be disregarded. Because we have concluded that the S.E.C. agreement is inapplicable to these rate increases, for the reasons stated below, we need not decide whether the S.E.C. agreement is subject to G. L. c. 164, § 94. Additionally, we need not decide what effect, if any, must be given to the S.E.C. agreement in a rate proceeding purportedly subject to its terms, even if it is not a contract referred to in § 94.[3]

We agree with the department that the S.E.C. agreement does not apply to a rate increase initiated by a filing of schedules of rates prior to the date of the acquisition of the Northern Division.[4] Paragraph 1 is concerned

---

[3] The S.E.C. agreement is not a private rate contract in the usual sense. In certain Federal rate regulatory matters private rate contracts may not be overriden simply by the filing of a new rate schedule with the regulatory agency. See *United Gas Pipe Line Co.* v. *Mobile Gas Serv. Corp.* 350 U. S. 332 (1956); *Federal Power Commn.* v. *Sierra Pac. Power Co.* 350 U. S. 348 (1956). Even if it is true, as the department stated, that it is not bound by the S.E.C. agreement, the company may be bound by it as to postacquisition rate filings, such as the filings dealt with by us as to interim rates in our recent decision in *Boston Gas Co.* v. *Department of Pub. Util.* 367 Mass. 92 (1975). Because the company must adhere generally to its filed rates (unless a special contract filed with the department otherwise provides [G. L. c. 164, § 94]), certainly the company, and seemingly the department, cannot ignore the possible impact of the S.E.C. agreement in those further proceedings.

[4] There is no ambiguity in the S.E.C. agreement which might be resolved by extrinsic evidence. In any event, there is no extrinsic evidence in the record, and an offer of proof by Robinson does not

with a rate proceeding to equalize rates between the two divisions. The rate schedules involved here do not accomplish equalization, and thus the company could support those rate schedules without violating paragraph 1.

Paragraph 2 bars the company, following the acquisition, from initiating any rate increases which are disproportionately adverse to the Northern Division. Harrington's claim that the company initiated the rate increase for the Northern Division after the acquisition cannot be sustained. The rate schedules for the Northern Division were filed by the North Shore companies in September, 1973, and thus the rate increases were initiated, in the normal sense of the word, prior to the acquisition. The company made no filing. It simply acquired the interest of the North Shore companies in their rate schedules when it acquired all of their assets three months later. The company's application for interim rates was merely a request for a partial lifting of the department's suspension orders.

Paragraph 2 does not prevent the company from supporting a rate proceeding which will result in a proportional disadvantage to the Northern Division, as paragraph 1 does with respect to the equalization of rates. If the interveners had wished to restrain the company from supporting rate increases initiated before the acquisition, the S.E.C. agreement should have so provided.

The department's decision on the issues raised in Harrington's appeal is affirmed.

*So ordered.*

THE BOSTON GAS COMPANY APPEAL.

The department's final order of December 13, 1974, approved the rate increases for the Northern Division as

present an understanding of the parties which would aid in an interpretation of the agreement, even if it were ambiguous.

filed and allowed an increase for the Boston Division of $426,000 above the $3,500,000 which had been authorized in the interim rate order. However, the department rejected about $2,700,000 of the $6,600,000 increase proposed for the Boston Division.

In its appeal the company argues that the department's disallowance of certain elements in the company's rate-making process results in confiscatory rates in violation of arts. 1, 10, and 12 of the Declaration of Rights of the Constitution of the Commonwealth and the Fourteenth Amendment to the Constitution of the United States. The company also argues that the department's order fails in various respects to meet the standards of § 14 (7) of the State Administrative Procedure Act (G. L. c. 30A).

There are four specific areas of contention between the company and the department. (1) The dispute with the greatest financial significance concerns an adjustment made by the department in the company's test year revenues, because the weather during the test year (1973) was warmer than normal. The company claims that there should be no weather adjustment, or, if one is to be made, it should be more limited than the only one made by the department. (2) and (3) There is a disagreement concerning two items which the company included in its rate base. First, the company objects to the department's reallocation of a portion of the company's new substitute natural gas plant to the Northern Division. This allocation reduced the rate needs of the Boston Division without increasing the revenue to be derived from the Northern Division. Second, the company challenges the department's exclusion of the company's unamortized retired plant from the rate base. (4) Finally, the company challenges the department's decision on what constitutes a fair return on the company's common equity capital.

Under the Federal and State Constitutions, the company is entitled to earn a fair and reasonable return on its investment. See *New England Tel. & Tel. Co.* v.

*Department of Pub. Util.* 327 Mass. 81, 94 (1951), and cases cited, and *Federal Power Commn.* v. *Hope Natural Gas Co.* 320 U. S. 591 (1944), for a fuller definition of a fair and reasonable return. In evaluating a claim that particular rates will not be adequate to earn a fair and reasonable return, this court must make its own judgment as to both law and facts. See *Boston Gas Co.* v. *Department of Pub. Util.*, *ante*, 51, 56 (1975), and cases cited.

The company argues that confiscation results from each of the individual errors committed by the department and from the aggregate revenue deficiency resulting from these claimed errors. The company points out the apparently undisputed fact that the company's actual return on equity in the years 1969 through 1973, inclusive, was substantially below the return on equity which the department had allowed in the company's rates.[5] It argues further that by disregarding its own prior decisions in order to produce a lower rate level, the department has acted in an arbitrary manner.

The record suggests an over-worked administrative agency which has failed to decide important, recurring policy questions, to explicate the reasons for them, and to apply them routinely without regard to their effect in individual rate proceedings. If the department were to change its practices, its burden would be eased, investors would have a clear statement of the department's views,

---

[5] The company does not contend that it is entitled to recoup past deficiencies.

The company's earnings for the years 1969 through 1973, inclusive, were as follows:

|      | Return on Equity Allowed by Department in Rates Authorized by it | Actual Return on Equity |
|------|------------------------------------------------------------------|-------------------------|
| 1969 | 10.75%                                                           | 5.56%                   |
| 1970 | 12.00%                                                           | 5.32%                   |
| 1971 | 12.00%                                                           | 7.57%                   |
| 1972 | 12.00%                                                           | 8.87%                   |
| 1973 | 12.00%                                                           | 7.60%                   |

and the department would not face the charge that its determinations on rate filings are opportunistic. As will be seen in the discussion of specific areas of dispute in the company's appeal, the company's strongest arguments rest on the department's apparent erratic behavior.

However, apart from the four specific items in contention, the company does not argue with specificity that the department has imposed on the company a rate-making process which produces confiscatory rates. We are not shown what occurred in recent years to depress the company's actual earnings far below those to which the department concluded it was entitled. The company does not claim that the specific circumstances producing those inadequate earnings of earlier years affected the decision which is the subject of this appeal. Therefore, we consider the company's confiscation argument only in the context of the four specific subjects of dispute.

*The weather adjustment.* In order to understand the disagreement concerning the so called weather adjustment, some background information is necessary. The company's rate-making method involves the use of a test year. The test year (1973) was warmer than normal, having 5,140 degree days.[6] In a warmer than normal year, less gas for heating will be sold than usual, all other things being equal, and, in a colder than normal year, more gas will be needed for heating than normal. More than 55% of the company's gas sales in a normal year are for heating.

Because of the sensitivity of the company's revenues to temperature variations, the question arises whether the use of a test year which is warmer or colder than normal may have an undesirable effect on rates based on that test year. For example, if the utility's expenses, many of

---

[6] The average number of degree days during the years 1923 through 1973, inclusive, was 5,758. A degree day as used in these proceedings is a measurement of the coldness of the weather based on the extent, if any, to which the daily mean temperature falls below sixty-five degrees Fahrenheit.

which are fixed, are allocated in rate making among units of gas sold during a relatively warm test year, the resulting rates may be more than adequate in a normal year when more gas is sold for heating. The reverse also is true. If the test year is colder than normal, the resulting rates may not be adequate in a year of normal temperature. The company made just this argument in its 1973 rate proceedings. It urged the department to permit it to adjust downward the revenues of its test year (1972), because 1972 had been colder than normal. The department rejected this argument in the 1973 proceedings, reciting errors and apparent uncertainties in the company's method of making the weather adjustment. The department also indicated that 1972 was only 3.7% colder than normal, stating that the company's method of calculating the weather adjustment was particularly unacceptable in such a year.

No weather adjustment was reflected in the rate schedules filed in the present proceeding. However, the department directed the company to submit a weather study. Without abandoning its position that no weather adjustment was appropriate, the company complied, adopting the position that no adjustment for weather should be made if a test year's degree days fall within a range of normality (within 352 degree days of normal); and, if a test year's degree days fall outside the range (as 1973 did), the adjustment should be only to the nearest edge of the range rather than to the midpoint of the range (i.e., the average annual degree days). An assistant attorney general argued before the department that the adjustment should be made to the average annual degree days, thus disregarding any range of normality.[7]

---

[7] The assistant attorney general who appeared before the department in these proceedings also argued the appeals in this court. We detect no significant difference between his position before the department and his position on behalf of the department before us. There may be occasions, however, where it would be inappropriate for the Attorney General (except through a specially appointed assistant) to

The parties stipulated that, if a weather adjustment were to be made without a range of normality, the test year revenues for the Boston Division would be increased by approximately $1,280,000. The company's evidence showed that, if an adjustment were made but only to the nearest edge of its selected range of normality, an upward adjustment of test year revenues for the Boston Division of about $372,000 would be required.

In its interim order in this proceeding, the department stated that "weather adjustments for temperature sensitive gas utilities are appropriate." It accepted as not unreasonable the use of the company's selected range of normality, but left open the question whether "a range of normality is necessarily the most appropriate procedure to use" and, if so, what statistical method of determining such a range would be preferable.[8] Thus although the interim order accepted the concept of a weather adjustment, it did not accept the company's selected method as the exclusive solution.

When the hearings were resumed following the interim order, the weather adjustment issue was considered further. The company's witness was subjected to further cross-examination on this subject, and the assistant attorney general offered an expert who testified concerning various alternatives. The department concluded in its final order that it lacked adequate information to determine how to select a range of normality. It decided to "apply the measurement of a normal degree day year" in

appear in court as counsel in support of an administrative agency's action if he has appeared before the agency as an advocate in the same proceeding.

[8] This interim acceptance of the company's presentation concerning a weather adjustment did not affect the level of interim rates allowed by the department. The department's calculations of the company's revenue deficiencies show that, even if a full adjustment of 1973 revenues had been made, there would have been a deficiency in each division even after reflecting revenues to be derived from the interim increases.

this case and "to make the range determination in an appropriate future case where there is additional evidence as to the appropriate system to be employed in determining the range." Two commissioners vigorously dissented from the department's abandonment of its acceptance of the range of normality shown by the company's evidence, pointing out apparent inconsistencies in the department's treatment of weather adjustments.

We turn first to the company's assertion that the department's treatment of the weather adjustment results in confiscation. If in making rates for the future there are unpredictable circumstances that will influence operating results, the experience of the past (adjusted for reasonably foreseeable changes) presents the logical basis for estimating future conditions. In the case of temperature, the experience of an adequate past period seems to be the logical starting place for any assumption concerning future conditions. Weather adjustments in rate making for gas utilities in this part of the country seem desirable, at least if the test year departs significantly from the norm.[9] Any adjustment which does not increase the revenues of a warmer-than-normal test year to reflect the degree days of an average year tends to give the company rates which are more favorable to it than it is likely to need. Thus we are unable to conclude that the department's rejection of the company's range of normality weather adjustment presents any question of confiscation.

The company's argument that weather adjustments may be ignored, because eventually the variations in the degree days of test years tend to average out, could support a decision to eliminate any weather adjustment or to use a range of normality. However, acceptance of such an argument does not prove that the rates which the

_____

[9] We would assume that the value of adjusting for a minor deviation from the norm would not merit the time and expense required.

department authorized for the company in this proceeding were confiscatory.

We turn then to the company's claim that the department failed to comply with its statutory obligations in dealing with the weather issue. Specifically, the company argues that the department's treatment of weather adjustments has been inconsistent, unfairly discriminatory, irresponsible, and capricious. It claims that the only consistency in the department's decisions is that they always reach the worst possible result from the company's point of view. In effect, the company urges that the department's decision on weather adjustment was arbitrary, capricious, and an abuse of discretion in violation of G. L. c. 30A, § 14 (7) (g).

The company has not demonstrated that the department acted arbitrarily or capriciously. In the 1973 proceedings, the company's first involving a weather adjustment, the company argued for a downward adjustment of its test year revenues because the test year (1972) had been colder than normal. The department rejected this contention because of a failure of proof. The company's appeal from the department's ruling (*Boston Gas Co.* v. *Department of Pub. Util.* 367 Mass. 92 [1975]) did not challenge this aspect of the department's decision.

When the rate schedules subject to this appeal were prepared by the company and the North Shore companies, no weather adjustment was made. Although this change of position by the company may have been prompted by the department's rejection of the company's weather adjustment in the 1973 proceeding, the company had no incentive to propose a weather adjustment because its new test year (1973) was the third warmest (in terms of degree days) in more than fifty years.[10]

---

[10] The evidence showed that since 1923 only 1949 (5,081 degree days) and 1953 (4,885 degree days) had fewer degree days than 1973 (5,140 degree days).

The department indicated that it wished to consider the question of a weather adjustment, and the company reluctantly responded. The department's interim order did not commit it to accept the company's weather adjustment proposal in its final decision. Clearly the decision was interlocutory. Moreover, as indicated above, the weather adjustment question had no influence on the level of the interim rates.

There was ample evidence from which the department could conclude that a weather adjustment to a "normal" year was appropriate in this case. Certainly the department was not compelled to accept the company's position. We recognize that computing the effect of weather on the revenues of a gas utility is not a simple process. However, the company did not explain why the adjustment should not be to normal, once it is decided that an adjustment is appropriate. Although there may be valid practical reasons for adopting a range of normality, the record before us furnishes none.[11]

---

[11] The range of normality proposed by the company was adapted from a procedure accepted by the New York Public Service Commission in *Re Long Island Lighting Co.* 90 P. U. R. 3d 93, 99-100 (N. Y. Pub. Serv. Commn. 1971). Some public utility regulatory agencies have rejected proposed weather adjustments. *Re City Gas Co. of Fla.* 64 P. U. R. 3d 518, 523 (Fla. Pub. Serv. Commn. 1966). *Re Mountain Fuel Supply Co.* 76 P. U. R. 3d 277, 285-286 (Utah Pub. Serv. Commn. 1968). *Union Elec. Co.* 47 Fed. Power Commn. Rep. 144, 148 (Mo. 1972). Such a rejection was upheld in *United Gas Corp.* v. *Mississippi Pub. Serv. Commn.* 240 Miss. 405, 427-429 (1961). An agency's approval of such an adjustment was sustained in *State ex rel. Util. Commn.* v. *Durham,* 282 N. C. 308, 320-322 (1972). The Federal Power Commission has said of any weather adjustment, "upward or downward, that a high standard of proof will be required to establish a variance from actual test period experience." *Knoxville Util. Bd.* v. *East Tenn. Natural Gas Co.* 35 Fed. Power Commn. Rep. 534, 538 (Tenn. 1966), affd. on other grounds sub nom. *Midwestern Gas Transmission Co.* v. *Federal Power Commn.* 388 F. 2d 444 (7th Cir. 1968), cert. den. 392 U. S. 928 (1968). Each of these proceedings involved an attempt by the regulated utility to adjust downward the revenues of a colder than normal year.

The company argues plausibly that it has been held to a stricter standard than other Massachusetts gas utilities which have sought a reduction in the revenues of test years which were colder than normal. The department has allowed other companies to reduce their test year revenues in such circumstances.[12] We do not have the records in those other proceedings before us and thus cannot tell whether the department's action in this case was unfairly discriminatory and hence arbitrary. It is clear, however, that the department's decisions in these various cases have not distinguished adequately between its treatment of the company and its treatment of other utilities on the subject of weather adjustments. Nevertheless, whatever discrimination may have existed before, we are not shown that it exists in the department's present decision.[13] The department's laconic, case-by-case treatment of the weather adjustment issue may

---

[12] The department apparently first allowed a weather adjustment in *Re Berkshire Gas Co.,* D. P. U. 16597 (January 13, 1971). In a brief discussion, the department accepted a downward adjustment of test year revenues to "basic figures which represent a normal year." Five months after it rejected the company's attempted reduction in 1972 revenues, it accepted such a reduction for other gas companies which used 1972 as their test year. See *Re Brockton Taunton Gas Co.,* D. P. U. 17750 (December 12, 1973), and *Re Springfield Gas Light Co.,* D. P. U. 17629 (December 12, 1973). The discussion of the weather adjustment issue in these decisions was brief, did not consider the detail of the proof, and made no reference to the company's 1973 proceedings.

[13] Another gas company using 1973 as a test year recently was obliged to produce a computation of the increase in revenues to mean or normal conditions (*Re Cape Cod Gas Co.,* D. P. U. 17902 [May 15, 1974]), and the department used that computation to adjust 1973 revenues upward. In that decision, issued eight days after the interim order in this proceeding, the department repeated its preference for weather adjustment "limited to years in which the number of degree days is outside the range of normalcy." However, because the only evidence concerning weather adjustment provided a correction to the norm, the department used it.

On December 30, 1974, the department rejected a range of normality and adjusted a company's test year revenues upward to the

constitute poor administrative judgment, but we cannot say that it is arbitrary, capricious or an abuse of discretion.

*The SNG plant.* The department did not exceed its authority in determining that a portion of the company's new substitute natural gas (SNG) plant should be allocated to the Northern Division for rate-making purposes. That new plant, which manufactures propane gas to be used during periods of peak demand, was ready for operation in December, 1973. Its entire cost was attributed to the Boston Division in arriving at the rate schedules which are the subject of these appeals. At the time of the preparation of those schedules, such a treatment of the SNG plant was unavoidable because the merger had not yet been completed. However, it was established at the rate hearings that approximately 36.5% of the SNG plant's production served the Northern Division. The department's final decision reduced the Boston Division's rate base by 36.5% of the net investment in the SNG plant and correspondingly reduced the allowable expenses for local real estate taxes.[14]

In objecting to the reallocation of a portion of the SNG plant from the Boston to the Northern Division, the company argues that the filings were separate for each division and should be judged on the circumstances existing at the time they were made. Additionally, the company argues that because gas flows occasionally from the Northern Division to the Boston Division, the depart-

---

normal degree day indications. *Re Lowell Gas Co.,* D. P. U. 18122 (December 30, 1974). The department's decision in the present proceeding was cited and followed in the *Lowell Gas Co.* decision. The two commissioners who dissented in this proceeding concurred, pointing out quite appropriately that the proper treatment of weather adjustments remained uncertain.

[14] The company states that its annual revenue was reduced by $377,000 because of the department's treatment of this issue. The expenses for local real estate taxes were reduced by 36.5% of the local taxes payable with respect to the SNG plant.

ment should have allocated to the Boston Division a portion of the assets of the Northern Division. The company points out that the allocation of a portion of the SNG plant to the Northern Division did not result in an offsetting increase in the rate level for that division because the Northern Division rates were approved in full as filed; and, in spite of that approval, there remained a substantial revenue deficiency, even before reflecting the consequences of the allocation of a portion of the SNG plant to the Northern Division.

The department ruled that the customers of the Boston Division should not be obliged to pay for the cost of a plant facility which serves others. We think that this conclusion is appropriate and lawful. Although the company argues that the department's action is unfair, it does not cite any statutory provision which is violated by the department's determination. The department could not be required to ignore the actual use of the SNG plant. The record discloses no evidence of any other asset the cost of which should have been apportioned between the two divisions because of similar proportional use.

The company was not powerless to correct the problem. It might have moved to amend the filed schedules. It could have filed new rate schedules for the Northern Division. In fact, one month after the order in these proceedings, the company did file new rate schedules. See *Boston Gas Co.* v. *Department of Pub. Util., ante,* 51 (1975).[15]

The department's treatment of the SNG plant raises no significant confiscation question. The company was not entitled to a return from its Boston Division customers on that portion of the SNG plant which served its Northern Division customers. There can be no valid constitutional

---

[15] The proposed interim rate schedules which were filed for each division in January, 1975, reflected proportional rate increases for each division, thus avoiding any controversy under the S.E.C. agreement.

objection to the department's treatment of the rates for the Northern Division because the department approved in full the rate increases reflected in the rate schedules filed for that division.

*Unamortized retired plant.* The department excluded unamortized retired plant from the rate base of the Boston Division, adhering to its ruling in the company's 1973 rate proceedings.[16] The department observed that its prior ruling was challenged in the company's appeal which was then pending in this court. About three months later, we held in *Boston Gas Co.* v. *Department of Pub. Util.* 367 Mass. 92 (1975), that the department failed to state adequately its reasons for its decision (*id.* at 104-105), and we ordered that the department's conclusions concerning unamortized retired plant be vacated. However, we authorized the department to file seasonably with the county court a statement of its reasons for the sudden exclusion of this item from the company's rate base after its inclusion in three prior proceedings. *Id.* at 105.

Shortly thereafter, consistent with our authorization, the department issued an order purporting to be a statement of reasons. A single justice stayed the department's final order of December 13, 1974, in so far as it excluded net unamortized retired plant from the company's rate base. The reservation and report of the company's appeal from the department's order of December 13, 1974, was consolidated with a reservation and report of the question whether the department's statement of reasons was adequate and lawful. The issue is the same in each proceeding.

The company argues that the statement of reasons is not legally sufficient to justify the department's treatment of unamortized retired plant. In support of its decision, the department stated that it "has consistently been of

---

[16] The company states that this action reduced its annual revenues by $263,000.

the opinion that unamortized retired plant should not be included in the rate base." It added that from 1971 until the 1973 proceeding it had misconstrued the opinion in *Boston Gas Co.* v. *Department of Pub. Util.* 359 Mass. 292 (1971), believing that this court had directed the inclusion of unamortized retired plant in the rate base.

It is not true that the department always has ruled that unamortized retired plant should be excluded from the rate base. It ruled otherwise in 1953 and 1954. We have no indication when the department changed its position or why.[17]

We cannot accept the department's contention that it has construed this court's 1971 decision as mandating the inclusion of unamortized retired plant in a company's rate base. The department excluded similar items from the rate bases of other companies after our 1971 decision. If the department felt bound by our 1971 decision, we assume that it would have applied the same rule of law to all utilities. A fair reading of our 1971 decision could not have led a reasonable person to conclude that we directed the inclusion of unamortized retired plant in the company's rate base. 359 Mass. at 314-315. The department's own order which immediately followed our 1971 decision does not support its present claim. The department recognized then that it was to reconsider certain issues and to file additional findings and rulings. In 1972, the department included unamortized retired plant in the company's rate base, saying that it had computed the company's rate base "in complete accordance with the methods used by the Department . . . [in the company's next prior rate proceeding]." The department expressed no reluctance or sense of compulsion in that decision.[18]

_____

[17] The company states that prior to the 1973 proceeding the department had dealt with the issue only in its 1953 and 1954 opinions.

[18] The department's recent statement of reasons for its change of treatment of unamortized retired plant is inconsistent with views ex-

We conclude that the statement of reasons furnished by the department does not adequately justify a change from the department's determination on three prior occasions to include the company's unamortized retired plant in its rate base. See *Boston Gas Co. v. Department of Pub. Util.* 367 Mass. at 104.

There is a difference between the department's treatment of weather adjustments for the company and the department's treatment of the company's unamortized retired plant, which makes the latter arbitrary and the former not. The record in each of the company's rate proceedings differed on the question of a weather adjustment, while the record concerning the treatment of unamortized retired plant did not. The department's asserted reasons for its treatment of unamortized retired plant find no support in the record, and they are largely refuted by the department's own prior conduct. In its treatment of weather adjustments the department has been troubled with a relatively new and unsettled subject. It has not ruled inconsistently on weather adjustments on substantially the same record, as it has with respect to the company's unamortized retired plant.

This issue involves almost entirely the unamortized cost of an oil gas manufacturing plant retired by the company in 1969. See *Boston Gas Co. v. Department of Pub. Util.* 367 Mass. at 94. When the cost of that facility has

---

pressed to this court in the department's brief filed with us in *Boston Gas Co. v. Department of Pub. Util.* 367 Mass. 92 (1975). In that brief the department made no claim that our 1971 opinion misled it into allowing unamortized retired plant to be included in the rate base. On the contrary, the department stated that it regarded that opinion as reserving "decision on this issue until . . . [the court] had the benefit of the Department's treatment of a question which was not squarely presented in the 1971 case."

In its recent statement of reasons the department made no mention of the argument advanced by it in that earlier brief that, if the useful life of the facility had been calculated properly, there would be no unamortized retired plant to include in the rate base. This is a question on which the department appeared to have made implied findings of fact. However, its further decision abandoned this subject.

been amortized, it may be reasonable for the department to adopt and apply a consistent policy on this subject for all utilities. The company should not be the beneficiary for the indefinite future of an advantage which apparently has not accrued to any other utility.

*Cost of equity.* The company objects to the department's conclusion that a return of 12.6% on common equity is adequate to meet the company's cost of equity capital and to "provide an appropriate allowance for [any] attrition which may result, should conditions of inflation continue without significant moderation." The company presented the only witness on the issue of the cost of capital, a person of competence and experience (Robert S. Jackson). He testified that a fair return on the company's common equity was no less than 13%.[19]

The department disagreed with certain of Jackson's conclusions. Jackson admitted that one approach he used had certain problems and might be suspect. Certainly the department was not obliged to accept Jackson's testimony in full, but some of its criticisms of Jackson's testimony are not persuasive. The department would have performed a more useful service if it had explained with greater precision how it arrived at 12.6%, referring particularly to the weight given to the need, which it saw, to provide an allowance for attrition. See *Boston Gas Co.* v. *Department of Pub. Util.* 359 Mass. 292, 307-311 (1971), for a discussion of "attrition" and its effect on rates of return for utilities. The department's decision

---

[19] When weighted with the cost of long-term debt, an undisputed item, the cost of equity capital urged by the company (13%) produces an indicated rate of return on capital of 10.40%. A similar computation using the cost of equity selected by the department (12.6%) produces a rate of return on capital of 10.22%. The company states that the difference in annual revenue between the two positions is $439,000 for the Boston Division. This computation assumes the rate base for which the company contends in this appeal. The rate base arrived at by the department was approximately $115,100,000, and the adjusted test year operating revenues (reflecting the department's adjustment for weather) were approximately $100,000,000.

on this subject is of interest to all utilities in selecting their rate-making procedures. It should have been an informative guide for future conduct.

On balance, however, we believe that the department did not exceed its statutory authority in selecting 12.6% as the proper allowance for a return on equity capital. This is an area of judgment, both for the department "in considering the fairness of rates, and . . . [for] us in determining whether the rates allowed by the . . . [department] will result in confiscation, a matter properly for our concern." *Id.* at 305. In addition, the company has not persuaded us that the loss of $439,000 in annual revenue will result in confiscation of its property.

If the subject were capable of determination with greater certainty, or if the discrepancy between the two positions were greater, we might conclude that the absence of affirmative expert testimony on the record in support of the department's determination was fatal. Here, however, the department did give some weight to Jackson's testimony, increasing the accepted return on equity capital to 12.6% from the 12% which had been allowed in the 1973 proceeding. Jackson discounted his own conclusions. We do not find prejudicial error (G. L. c. 30A, § 14 [7]) in the department's decision to discount Jackson's conclusions somewhat further.

The absence of substantial evidence to support the department's determination would not have compelled the department to accept the company's evidence on rate of return. If, as is the case, the department did not fully accept Jackson's opinion and if the State Administrative Procedure Act does not permit the department to treat return on equity capital as it did, the department would have been obliged to disapprove the rate schedules entirely, a result which the company hardly could have desired.

*Conclusion.* The case must be remanded to the county court, where judgment shall be entered vacating the

department's decision in so far as it excludes the company's unamortized retired plant from its rate base.

*So ordered.*

THE ROBINSON APPEAL.

Robinson raises several arguments in his appeals, in addition to claims already disposed of concerning the S.E.C. agreement. Although Robinson was a party before the department, it is doubtful that he is "an *aggrieved* party in interest" (emphasis supplied), with respect to subjects unrelated to the S.E.C. agreement. G. L. c. 25, § 5.[20] A person's intervention before the department may qualify him as a "party" (see *Save the Bay, Inc.* v. *Department of Pub. Util.* 366 Mass. 667, 673 [1975]), but a party must be aggrieved by the decision, order, or ruling of the department in order to appeal. See G. L. c. 25, § 5.

However, because it makes no difference in the result, we deal briefly with Robinson's other arguments. (a) There was no error in allowing certain of the company's sales expenses. The department did not abuse its discretion in accepting the company's judgment on this matter. (b) The department was not obliged to strike the testimony of a company witness concerning the computation of the weather adjustment. See *Sudbury* v. *Department of Pub. Util.* 351 Mass. 214, 223 (1966). (c) The department did not err in denying Robinson's motions for fees and expenses. The Legislature has allowed counsel fees to litigants in many situations, but it has not done so for parties before the department. We see no basis for

---

[20] Robinson is not a customer of the company. He does not represent any customer. Indeed, he is not an attorney. However, he was a signatory to the S.E.C. agreement and was treated as a party before the department on all issues.

adopting a common law rule allowing counsel fees in administrative proceedings which is broader than the existing rule in court proceedings. See *Commissioner of Ins.* v. *Massachusetts Acc. Co.* 318 Mass. 238, 241 (1945); *Donaldson* v. *Boston Herald-Traveler Corp.* 347 Mass. 274, 280-281 (1964).

The decision of the department concerning the issues raised by Robinson in his appeal from the department's final order is affirmed. Robinson's appeal from the department's interlocutory order is dismissed, because it is not an appeal from a final decision, order or ruling of the department.

*So ordered.*