MASSACHUSETTS ELECTRIC COMPANY *vs.* DEPARTMENT OF PUBLIC UTILITIES.

Suffolk. February 13, 1978. — September 7, 1978.

Present: HENNESSEY, C.J., QUIRICO, KAPLAN, WILKINS, & ABRAMS, JJ.

*Public Utilities*, Regulation. *State Administrative Procedure Act. Practice, Civil*, Review of order of department of public utilities. *Due Process of Law*, Public utilities.

With respect to ascertainment of the cost of equity in determining rates to be charged by an electric company, one of four wholly owned electric operating subsidiaries of a holding company and the appellant in a rate proceeding in 1976 under G. L. c. 25, § 5, this court affirmed the decision of the Department of Public Utilities, that the 12% cost of equity established for the appellant in a 1975 rate proceeding should be maintained, and held that the 12% return on equity was not shown to be confiscatory, notwithstanding testimony of experts for the appellant, which restricted its activi-

ties to retail distribution, that the holding company's cost of equity should serve as a proxy for the appellant in order to apply the "comparable earnings" test and the "capital attraction" standard of other utilities; evidence was lacking of the earnings performance of the subsidiaries, each of which was regulated by a different agency, and of an alternative method to the proxy approach. [297–298]

With respect to ascertainment of the cost of equity in determining rates to be charged by an electric company, one of four wholly owned electric operating subsidiaries of a holding company and the appellant in a rate proceeding in 1976, the decision of the Department of Public Utilities that the 12% cost of equity established for the appellant in a 1975 rate proceeding should be maintained, rejecting appellant's argument that use of the company's actual capital structure was erroneous and that the only method of ascertaining its cost of equity was to use the cost of equity of the holding company as a proxy, was warranted by findings made by the Department supported by substantial evidence and by its statement of reasons for the decision, particularly its discussion concerning the different degrees of risk among the holding company's subsidiaries; the decision did not constitute an abuse of discretion, and was not based on legal error. [298–308]

The mere fact that the rate of return on equity allowed to an electric company by the Department of Public Utilities did not result in maintenance of the market price of the company's stock above book value did not render the rate allowed confiscatory [308–309]; nor was the rate rendered confiscatory by reason of the Department's failure to incorporate an attrition adjustment, allegedly needed due to inflation, where the company did not demonstrate that its failure to earn the allowed rate was the result of the Department's decisions or that the gap between the allowed return and the earned return was due to increased construction costs [309–310]; in the circumstances it was appropriate for the Department to maintain the rate of return on the company's equity which it had established in an earlier proceeding [311].

The burden of demonstrating unconstitutional discrimination on the part of the Department of Public Utilities, in setting a rate of return on equity of an electric company which was the lowest return allowed by the Department to any electric utility in over a year, was not satisfied where the company did not attempt affirmatively to show that no factual situation conceivable supported the reasonableness of the differential treatment of like entities [311–312]; the department's reasons for its decision were supported by substantial evidence, and warranted its conclusion on the company's return on equity, and the department's failure to explain why it reached

different conclusions concerning cost of equity in other electric utility cases was not arbitrary and capricious [312].

CIVIL ACTION commenced in the Supreme Judicial Court for the County of Suffolk on January 10, 1977.

The case was reported by *Liacos*, J.

*Samuel Huntington (Thomas G. Robinson* with him) for the Massachusetts Electric Company.

*S. Stephen Rosenfeld*, Assistant Attorney General, for the Department of Public Utilities.

ABRAMS, J. Massachusetts Electric Company (Mass. Electric) appeals under G. L. c. 25, § 5, from the November 30, 1976, decision, order, and rulings of the Department of Public Utilities (Department) in a rate proceeding, D.P.U. 18599. The Department approved rates designed to produce additional revenue of $15,372,000, but decided to maintain the 12% cost of equity which it had set for Mass. Electric in its previous rate proceeding, D.P.U. 18204, which was decided on October 31, 1975. A single justice of this court has reserved and reported the case for decision.

This appeal deals solely with the correctness of the Department's determination concerning the cost of equity. Mass. Electric argues (1) that, because it is a wholly owned subsidiary of the New England Electric System (NEES), the Department's refusal to use NEES as a proxy for Mass. Electric in determining the cost of equity resulted in a confiscatory rate of return on equity and was erroneous under the standards set forth in the State Administrative Procedure Act (APA), G. L. c. 30A, § 14 (7); (2) that the 12% rate of return on common equity is itself confiscatory because it would result in forced dilution of the equity of existing stockholders and because it did not reflect an attrition adjustment; and (3) that in allowing 12% as the cost of equity the Department discriminated against Mass. Electric in violation of constitutional and statutory standards. We affirm the decision of the Department and hold that (1) the rejection of the proxy ap-

proach did not result in a confiscatory cost of equity and that it was not erroneous under the APA; (2) Mass. Electric has not demonstrated that either dilution or attrition will occur as a result of the allowance of a 12% cost of equity; and (3) Mass. Electric has not shown unlawful discrimination.

## I. HISTORY OF PROCEEDINGS.

In D.P.U. 18204 the Department allowed Mass. Electric a 12% cost of equity. In that proceeding Mass. Electric also argued that the use of NEES as a proxy was the appropriate method by which to determine the cost of equity for Mass. Electric, and that all the experts who testified concerning cost of equity based their determinations on the cost of equity to NEES. However, evidence concerning the earnings performance of the subsidiaries of NEES was also presented. The Department rejected the proxy approach, noting in particular that Mass. Electric had earned a higher return on NEES's investment than had the other subsidiaries of NEES, and found on the basis of the evidence before it that 12% was a reasonable rate of return on common equity.

Mass. Electric chose not to appeal that decision. Almost three months later, in D.P.U. 18599, it filed a proposed schedule of rates and charges designed to raise retail rates by $18,955,000[1] effective February 1, 1976. The Department suspended the proposed rates until December 1, 1976.

Hearings on the proposed rates began on August 16, 1976, covered seventeen days thereafter, and ended on October 13, 1976. The interveners were a group of customers of Mass. Electric, the Attorney General, and the Massachusetts Consumers' Council.

The four witnesses who testified for Mass. Electric concerning the cost of equity based their determinations on

---

[1] As noted, the Department allowed a revenue increase of $15,372,-000.

the premise that NEES should serve as a proxy for Mass. Electric in setting a cost of equity figure. The return on equity which they found to be necessary as a result of using the proxy method ranged from 14% to 14.9%. None of their testimony offered an alternative to the proxy approach. In addition, none of it responded specifically to the reasons given by the Department for rejecting the proxy method in D.P.U. 18204, and no evidence concerning the earnings performance of the NEES subsidiaries, data which the Department found highly relevant in D.P.U. 18204, was presented. The expert who testified for the public agency interveners also relied on NEES as a proxy for determining cost of equity. However, he adjusted downward the figure he derived using NEES as a proxy, to reflect the fact that NEES had debt funds as well as equity funds available to finance Mass. Electric's equity requirements; he recommended a rate of return on equity of 10.52% for Mass. Electric.

The Department, consistent with its prior decision, rejected the use of the proxy method because of the absence of evidence, especially evidence of the earnings performance of the NEES subsidiaries, to justify a change from its earlier decision and also because of additional reasons discussed *infra.* The Department concluded that Mass. Electric had not presented sufficient evidence to warrant a change in the cost of equity which has previously been established, and it therefore determined to maintain the 12% figure in effect.

## II. METHOD OF DETERMINING COST OF EQUITY.

A. *Confiscation.*

Mass. Electric first argues that the Department's rejection of the use of NEES as a proxy for Mass. Electric in determining the cost of equity resulted in the setting of a confiscatory rate of return on equity.[2] The heart of its

---

[2] To the extent that Mass. Electric asserts a claim of confiscation, it is entitled to independent review of both the law and the facts.

contention is that using NEES as a proxy is the only way in which Mass. Electric's cost of equity can be determined.

Confiscation results when a ratemaking decision deprives a utility of the opportunity to earn a fair and reasonable return on its investment. *Boston Edison Co.* v. *Department of Pub. Utils.*, 375 Mass. 1, 10 (1978). *Boston Gas Co.* v. *Department of Pub. Utils.*, 368 Mass. 780, 789-790 (1975). "A return is fair and reasonable if it covers utility operating expenses, debt service, and dividends, if it compensates investors for the risks of investment, and if it is sufficient to attract capital and assure confidence in the enterprise's financial integrity." *Fitchburg Gas & Elec. Light Co.* v. *Department of Pub. Utils.*, 371 Mass. 881, 884 (1977). See *Boston Edison Co.* v. *Department of Pub. Utils.*, *supra* at 10, and cases cited. A utility which alleges that the Department has set confiscatory or otherwise unlawful rates has the burden of proving these allegations. *Fryer* v. *Department of Pub. Utils.*, 374 Mass. 685, 690 (1978). *Fitchburg Gas & Elec. Light Co.* v. *Department of Pub. Utils.*, *supra* at 885. This court will not lightly interfere with the exercise of the Department's rate-making power; confiscation must be clearly established on the record before us. *Boston Edison Co.* v. *Department of Pub. Utils.*, *supra* at 10-11.

In this case, as in other rate proceedings, the Department used the "cost of capital" method to determine the fair rate of return. One step in applying this method, and the only one at issue in the present case, involves determining the cost of equity. In general, the return on equity must equal at least "the amount which the company

*Fitchburg Gas & Elec. Light Co.* v. *Department of Pub. Utils.*, 375 Mass. 571, 574 (1978). *Boston Edison Co.* v. *Department of Pub. Utils.*, 375 Mass. 1, 9 (1978). In so far as the errors alleged by Mass. Electric do not give rise to a claim of confiscation, the standard of review is that set forth in the APA. *Fitchburg Gas & Elec. Light Co.* v. *Department of Pub. Utils.*, *supra. Boston Edison Co.* v. *Department of Pub. Utils.*, *supra.*

would have to pay in order to 'hire' its equity capital under current conditions." *New England Tel. & Tel. Co. v. Department of Pub. Utils.*, 327 Mass. 81, 88 (1951). See *Boston Edison Co. v. Department of Pub. Utils.*, *supra* at 11.

The return on equity "should be commensurate with returns on investments in other enterprises having corresponding risks." *FPC v. Hope Natural Gas Co.*, 320 U.S. 591, 603 (1944). See *Boston Edison Co. v. Department of Pub. Utils.*, *supra* at 12. In addition, the rate of return on equity "should be sufficient to assure confidence in the financial integrity of the enterprise, so as to maintain its credit and to attract capital." *FPC v. Hope Natural Gas Co.*, *supra*. See *Boston Edison Co. v. Department of Pub. Utils.*, *supra* at 13-14.

Mass. Electric contends that without using NEES as a proxy in determining the cost of equity it would be impossible to apply the "comparable earnings" test. Mass. Electric is one of four wholly owned electric operating subsidiaries of NEES,[3] a registered holding company under the Public Utility Holding Company Act of 1935, 15 U.S.C. § 79 et seq. (1970). Mass. Electric, which sells electric energy directly to retail customers in 145 cities and towns across Massachusetts, owns no generation or bulk transmission facilities, and purchases its entire power requirements for resale from New England Power Company (NEPCO), another wholly owned subsidiary of NEES.

Mass. Electric argues that since it is the only wholly owned electric subsidiary of its size which restricts its activities to distribution, no comparable companies exist by which its cost of equity may be determined. Comparability, however, is a question of degree. The cost of equity of similar, although not identical, companies could be evaluated, and adjustments could be made for significant differences in characteristics. See *Boston Gas Co. v. De-*

---

[3] The other three subsidiaries are New England Power Company, Narragansett Electric Company, and Granite State Electric Company.

*partment of Pub. Utils.*, 359 Mass. 292, 302-306 (1971); *Wannacomet Water Co. v. Department of Pub. Utils.*, 346 Mass. 453, 467-470 (1963).

Mass. Electric next argues that, because as a wholly owned subsidiary, its ability to attract capital is dependent on NEES's ability to attract capital, the cost of equity to Mass. Electric, equals the cost of equity to NEES. Thus, Mass. Electric maintains that it is impossible to determine its return on equity under the "capital attraction" standard without using the proxy approach.

However, when there is more than one subsidiary, the cost of equity of a subsidiary is not necessarily the same as the cost of equity of the parent corporation. The cost of equity of the parent corporation reflects the aggregate of the costs of equity of each of its various subsidiaries. If the subsidiaries are characterized by different degrees of risk, the cost of equity of the parent corporation will not equal the cost of equity of each of the subsidiaries. In fact, if the return on equity of the parent corporation is used as the cost of equity for the subsidiaries, the less risky subsidiaries will be allowed too great a cost of equity and the ratepayers of that utility will be subsidizing the utilities subject to greater risks. While conceivably some adjustments might be made to eliminate the subsidization problem if all the subsidiaries were regulated by the same regulatory body, where, as here, the subsidiaries are regulated by different agencies,[4] such a solution is impossible. See Fitzpatrick, Subsidiaries' Capital Costs—A Compromise Approach, 99 Pub. Utils. Fort. 23, 24 (No. 13, June 23, 1977).

Moreover, it is not generally agreed that the use of a proxy approach is the appropriate method by which a wholly owned subsidiary's cost of equity should be deter-

---

[4] Mass. Electric is regulated by the Massachusetts Department of Public Utilities; NEPCO is regulated by the Federal Energy Regulatory Commission (formerly the Federal Power Commission); Narragansett Electric Company operates in Rhode Island; and Granite State Electric Company operates in New Hampshire.

mined. Rather, several different approaches are advocated and used. See *Norton Water Co.* v. *Public Utils. Comm'n*, 24 Conn. Supp. 441 (Super. Ct. 1962); *Penn Sheraton Hotel* v. *Pennsylvania Pub. Util. Comm'n*, 198 Pa. Super. Ct. 618, 632-633 (1962); *Michigan Bell Tel. Co.*, 85 P.U.R.3d 467, 489 (Mich. Pub. Serv. Comm'n 1970); *General Tel. Co. of the Southeast*, 18 P.U.R.4th 440, 470 (N.C. Utils. Comm'n 1976); *Pennsylvania Pub. Util. Comm'n* v. *Allegheny County Steam Heating Co.*, 19 P.U.R.4th 422, 438 (Pa. Pub. Util. Comm'n 1977); *Wisconsin Natural Gas Co.*, 92 P.U.R.3d 164, 169 (Wis. Pub. Serv. Comm'n 1971); Fitzpatrick, Subsidiaries' Capital Costs—A Compromise Approach, 99 Pub. Utils. Fort. 23 (No. 13, June 23, 1977).

When alternative methods are available, the Department is free to select or reject a particular method as long as its choice does not have a confiscatory effect or is not otherwise illegal. *New England Tel. & Tel. Co.* v. *Department of Pub. Utils.*, 372 Mass. 678, 683-684 (1977). *Fitchburg Gas & Elec. Light Co.* v. *Department of Pub. Utils.*, 371 Mass. 881, 886 (1977). *New England Tel. & Tel. Co.* v. *Department of Pub. Utils.*, 371 Mass. 67, 71 (1976). *Boston Gas Co.* v. *Department of Pub. Utils.*, 367 Mass. 92, 98 (1975). We find that the 12% return on equity has not been shown to be confiscatory.

B. *Review Under State Administrative Procedure Act.*

Under G. L. c. 30A, § 11(8), inserted by St. 1954, c. 681, § 1, the Department must provide "a statement of reasons for the decision, including determination of each issue of fact or law necessary to the decision." These reasons must warrant the Department's conclusion. See *Westborough* v. *Department of Pub. Utils.*, 358 Mass. 716, 717-718 (1971). General Laws c. 30A, § 14 (7), provides for judicial review of the Department's decision to determine, inter alia, whether it is based on an error of law, whether it is supported by substantial evidence, and whether it constitutes an abuse of discretion.

The Department stated that because of the probability that the different subsidiaries would be characterized by

different degrees of risk, the proxy approach should not be applied. As one indication that this difference in risks existed, the Department noted that there were differences between the coverage of fixed charges of NEES and that of fixed charges and preferred dividends of Mass. Electric. For these reasons, the Department rejected the use of NEES as a proxy in determining Mass. Electric's cost of equity. The Department went on to state that even if the subsidiaries earned the same percentage on NEES's respective investments in them, the cost of equity of NEES still could not be used as a proxy. Since NEES's investment in Mass. Electric is represented by debt as well as equity, the return on NEES's equity would be higher than the return on Mass. Electric's equity if the cost of debt to NEES is less than the cost of equity to Mass. Electric. Finally, the Department noted that to use NEES as a proxy would be contrary to the doctrine of *Mystic Valley Gas Co.* v. *Department of Pub. Utils.*, 359 Mass. 420 (1971).

Mass. Electric contends that none of these reasons is sufficient under the standards of the APA.

1. *Error of Law.*

Mass. Electric argues that the *Mystic Valley* decision neither warrants nor supports the decision to reject the proxy approach and thus, that the Department erroneously applied that decision in reaching its conclusion. In *Mystic Valley Gas Co.* v. *Department of Pub. Utils.*, *supra,* we concluded that unless the capital structure of a regulated company varied so unreasonably and substantially from the usual practice as to impose an unfair burden on the consumer, the utility was entitled to have its actual capital structure used in determining a fair rate of return.

The debt equity ratio of a company affects its cost of equity. If NEES were used as a proxy for Mass. Electric, NEES's capital structure would thus affect Mass. Electric's cost of equity. Therefore, although the rejection of the proxy approach would not seem to be compelled by

*Mystic Valley*, that decision's requirement of using a company's actual capital structure does provide support for the Department's decision.

2. *Substantial Evidence.*

*a. Differing rates of return.* Mass. Electric next advances several arguments primarily directed to demonstrating that the Department's finding that it is probable that the subsidiaries are characterized by different degrees of risk does not warrant the rejection of the proxy approach. As previously discussed, such a finding supports a conclusion that Mass. Electric's cost of equity does not equal NEES's cost of equity. Thus, this finding, which demonstrates the inaccuracies and shortcomings of the proxy method, warrants the Department's decision to reject the proxy approach.

Mass. Electric further argues that this finding is not supported by substantial evidence. If there is a paucity of evidence on this point, it must be attributed to Mass. Electric. The burden of proof that a rate increase was necessary was on Mass. Electric. In D.P.U. 18204, the Department, in rejecting the proxy approach, relied heavily on comparative earnings figures for the various subsidiaries. In spite of the fact that it is clear that the Department found such evidence extremely relevant, Mass. Electric chose not to present data concerning comparative earnings in this case. Mass. Electric, therefore, must be charged with the lack of detailed evidence on this issue. See *William Rodman & Sons* v. *State Tax Comm'n,* 373 Mass. 606 (1977).

We conclude that there was sufficient evidence to support the Department's finding. The Department's decision in D.P.U. 18204, which was part of the record in this case, indicated that the NEES subsidiaries were characterized by different degrees of risk. Moreover, considering "the experience, technical competence, and specialized knowledge" of the Department, G. L. c. 30A, § 14 (7), as appearing in St. 1973, c. 1114, § 3, it was more than reasonable for the Department to conclude that there was a

high probability that different subsidiaries would in fact possess different earning capabilities.

*b. Coverages.* Mass. Electric argues that, although the record indicates that there were differences in coverages, there was no evidence to indicate that coverage ratios are relevant in determining cost of equity.[5] Coverage ratios are, however, one indication of the risk associated with a company. See *New England Power Co.,*     F.P.C.     , -     (1977). [a] Although, as Mass. Electric points out, no witness testified that they are relevant in determining return on equity, there was also no evidence presented that coverage ratios were not significant in making such a decision. In such a situation, the Department may give weight to that evidence which, in the exercise of its expertise, it finds persuasive. See *Boston Edison Co.* v. *Department of Pub. Utils.,* 375 Mass. 1, 12 (1978); *Wannacomet Water Co.* v. *Department of Pub. Utils.,* 346 Mass. 453, 465-471 (1963); G. L. c. 30A, § 14(7).

*c. NEES's debt.* The Department concluded that, since NEES's investment in Mass. Electric is represented by both debt and equity, Mass. Electric's cost of equity is less than NEES's cost of equity. Mass. Electric challenges this finding on the ground that it is not supported by substantial evidence.

Mass. Electric contends that since NEES's debt consisted of debentures payable eight months from the end of

---

[5] Neither the Department in its decision, nor the parties in their briefs, defined precisely what they were referring to as "coverages." In general, coverage ratios depict the relationship between interest and other fixed charges on the one hand, and the amount of corporate earnings available to pay them on the other. See Munn's Encyclopedia of Banking and Finance 238 (7th ed. 1973). Since we have not been provided with a more specific definition, we will use this general concept of coverage ratios in discussing the coverage issue. In the future, the parties and the Department would best ensure meaningful judicial review by defining any terms which have a particular technical meaning.

[a] Docket Nos. E-8641, E-8476, E-8251, E-8169; Op. No. 803, slip op. at 57-58 (June 6, 1977).

the test period, they should not have been classified as part of NEES's permanent capital structure, but rather should have been considered a current liability. Mass. Electric, however, does not claim that this debt would not be refinanced; in fact, as Mass. Electric implicitly admits, the debentures probably were refinanced.[6] Thus, they were correctly considered to constitute debt in evaluating NEES's capital structure.

Mass. Electric states that the proceeds of the original debenture issue were not directly invested in the equity of Mass. Electric, but rather were used to facilitate the 1946 reorganization of NEES. Therefore, it claims that the Department's decision to consider NEES's debt in determining Mass. Electric's cost of equity is inconsistent with *Brockton Edison Co.*, 14 P.U.R.4th 186, 193 (Mass. Dep't Pub. Utils. 1976) which found that it was inappropriate to adjust a subsidiary's rate of return for the parent corporation's debt when the proceeds of the debt were not invested for the subsidiary's benefit. It is not clear that expenses spent in a general reorganization would not be viewed as benefiting Mass. Electric. Moreover, Mass. Electric does not claim that it has not benefited from any subsequent debt that might have been incurred by NEES. Thus, we cannot conclude that the Department's decision is inconsistent with its approach in *Brockton Edison Co., supra.*

Mass. Electric also states that NEES and Mass. Electric would not have different common equity costs even if the debentures were considered since NEES's fiscal and corporate expenses offset any leverage which the debentures might provide. The contentions that the expenses are equivalent to the leverage and that they should be used to offset leverage are simply not supported by the record.

---

[6] Mass. Electric does not claim that these debentures were retired, and it elicited testimony during the hearings concerning the interest rate at which the debentures could be refinanced.

Mass. Electric contends that, even if the Department's finding on this issue were supported by substantial evidence, it does not warrant rejection of the proxy approach. Although there is some controversy concerning the validity of the theory that debt in the parent corporation's capital structure reduces the cost of equity of the subsidiary, see *Brockton Edison Co.*, 14 P.U.R.4th 186, 193 (Mass. Dep't of Pub. Utils. 1976), it is an approach that is accepted by some experts. Since this theory demonstrates that simply using the cost of equity of the parent corporation as the cost of equity for the subsidiary would yield too high a cost of equity for the subsidiary, it warrants the Department's rejection of the proxy approach. At this point Mass. Electric argues for the first time that it would be possible to derive Mass. Electric's cost of equity by determining NEES's cost of equity and adjusting the figure thus obtained for NEES's debt.[7] The Department, of course, may choose to utilize this or some similar approach. However, the availability of these alternatives does not require the use of NEES as a straight proxy for Mass. Electric in determining cost of equity, the position urged by Mass. Electric throughout these proceedings.

3. *Abuse of Discretion.*

Mass. Electric argues that the Department's decision to reject the proxy approach was arbitrary and capricious and constituted an abuse of discretion. It maintains that it would be impossible to determine Mass. Electric's cost of equity under either the capital attraction test or the comparable earnings test without using NEES as a proxy. We have already considered and rejected this contention.

Mass. Electric also claims that three findings which it contended were not supported by substantial evidence do not provide a sufficient rationale to withstand scrutiny under the arbitrary and capricious standard. We have

---

[7] The witness who testified for the public agency interveners concerning cost of equity used precisely this approach.

analyzed these findings in detail and have concluded that they logically support the Department's decision to reject the proxy approach. There was no abuse of discretion.

In summary, we conclude that the Department's decision was not based on legal error, that the findings made by the Department were supported by substantial evidence, that the reasons provided by the Department, particularly the discussion concerning the different degrees of risks among subsidiaries, warranted its rejection of the proxy approach, and that its decision did not constitute an abuse of discretion.[8]

### III. ILLEGALITY OF RATES.

Mass. Electric argues that the 12% return on equity was itself confiscatory because it would result in forced dilution of the existing shareholders' equity and because it did not incorporate an attrition adjustment. Since Mass. Electric does not allege any other grounds by reason of which the cost of equity may be challenged as confiscatory, we consider its confiscation argument only in the context of these claims. See *Boston Gas Co.* v. *Department of Pub. Utils.*, 368 Mass. 780, 791 (1975).

A. *Dilution.*

Relying on *New England Tel. & Tel. Co.* v. *Department of Pub. Utils.*, 371 Mass. 67, 75-78 (1976), Mass. Electric argues that the 12% return on equity is confiscatory because it is not sufficient to maintain the market price of Mass. Electric's stock above the stock's book value. In *Boston Edison Co.* v. *Department of Pub. Utils.*, 375 Mass. 1 , 15-17 (1978), we considered in detail, and rejected, the

---

[8] The Attorney General moved to submit additional evidence consisting of portions of the testimony of an expert witness for Mass. Electric in its subsequent rate proceeding; this witness also testified for Mass. Electric in the present case. In order that the record may be complete, Mass. Electric moved to submit the witness's complete testimony in the subsequent proceeding. The testimony concerns the necessity of using NEES as a proxy and shows NEES's current cost of equity. In light of the decision we reach on the proxy issue, we deny the motions.

contention that the capital attraction test requires the adoption of a per se rule that the rate of return on equity must be sufficient to maintain market price above book value. See *Fitchburg Gas & Elec. Light Co.* v. *Department of Pub. Utils.*, 375 Mass. 571, 577 (1978). Mass. Electric has not argued nor has it shown that "the utility has a demonstrable inability to attract capital and ... [that] investors face a risk of continual dilution even as the utility finances its normal operations." *Boston Edison Co.* v. *Department of Pub. Utils., supra* at 16. See *New England Tel. & Tel. Co.* v. *Department of Pub. Utils., supra.* We have declined to mandate a rule requiring rates which enable market price to exceed book value. Therefore, since Mass. Electric has not demonstrated any compelling reason why the market price of its stock must be maintained above book value, the fact that the allowed return on equity would not achieve this result does not render the rate confiscatory.

B. *Attrition.*

Mass. Electric also argues that due to inflation it has not been able to earn its allowed rate of return for the past five years. It therefore contends that the rate of return on equity was confiscatory because it did not incorporate an attrition adjustment.

Attrition is the " 'tendency of the rate of return to diminish in a period of comparatively high construction costs' [quoting from *New England Tel. & Tel. Co.* v. *Department of Pub. Utils.*, 331 Mass. 604, 622 (1954)]. In times of inflation, as old plant is retired, the new plant built to replace it costs more. If investment increases more rapidly than revenue, the rate of return is diminished. See *Boston Gas Co.* v. *Department of Pub. Utils.*, 359 Mass. 292, 307 n.19 (1971)." *New England Tel. & Tel. Co.* v. *Department of Pub. Utils.*, 371 Mass. 67, 72 (1976).

Mass. Electric's bald assertion that it has been unable to earn its allowed rate of return primarily due to the effects of inflation is insufficient to entitle it to an attrition adjustment. It does not necessarily follow, even given

the presence of inflation, that a failure to earn the allowed rate of return entitles a company to an attrition adjustment. The return earned depends on many factors, some of which, such as operating efficiency, are within the control of the company. Mass. Electric has not sought to demonstrate that its failure to earn the allowed rate of return is the result of the Department's decisions, rather than the result of factors which are under its own control. See *Boston Gas Co.* v. *Department of Pub. Utils.*, 368 Mass. 780, 791 (1975). Cf. *New England Tel. & Tel. Co.* v. *Department of Pub. Utils.*, *supra* at 72-74; *Boston Gas Co.* v. *Department of Pub. Utils.*, 359 Mass. 292, 307-311 (1971).

Moreover, Mass. Electric has not sought to demonstrate that the gap between the allowed return and the earned return is the result of an expansion in the rate base due to increased construction costs, the hallmark of attrition. See *New England Tel. & Tel. Co.* v. *Department of Pub. Utils.*, *supra* at 72-74; *Boston Gas Co.* v. *Department of Pub. Utils.*, 359 Mass. 292, 307-311 (1971). Indeed, the record indicates that there has been no large growth in plant in the recent past, and that no substantial growth is contemplated in the near future. The Department found that plant in service increased less than 3% from September 30, 1975, to September 30, 1976. In 1977, when Mass. Electric applied to redeem 100,000 shares of its preferred stock, it represented to the Securities and Exchange Commission that it did not expect to undertake any permanent financing within the next four or five years, and that one reason for this decision was that its construction had been substantially reduced from its previous level.

Since Mass. Electric has not specifically indicated the reasons for its failure to earn the allowed rate of return and since, in particular, it has not linked this failure to construction, it has failed to satisfy its burden of proof on the attrition issue.

C. *Substantial Evidence.*

As indicated, the Department's rejection of the proxy approach was justified by substantial evidence. Since the experts who testified on the cost of equity based their conclusions on the cost of equity of NEES, there was no independent evidence of the cost of equity of Mass. Electric. And, as just discussed, Mass. Electric failed to demonstrate that the return on equity should be sufficient to maintain the market price of its stock above the stock's book value and that an attrition adjustment was necessary. In these circumstances, it was appropriate for the Department to maintain the rate of return on equity which it had established in D.P.U. 18204. See *Fryer* v. *Department of Pub. Utils.*, 374 Mass. 685, 690-692 (1978). See also *Boston Gas Co.* v. *Department of Pub. Utils.*, 368 Mass. 780, 803-804 (1975).[9]

IV. DISCRIMINATION.

Mass. Electric argues that the Department, in setting a 12% rate of return on equity, has discriminated against it because this return is the lowest which has been allowed any electric utility which has come before the Department for a rate increase since September 30, 1975. Mass. Electric contends that because no rational basis exists for this discrimination the Department's decision violates the equal protection clause of the Fourteenth Amendment to the Constitution of the United States and art. 1 of the Declaration of Rights of the Massachusetts Constitution. Mass. Electric further maintains that, because the Department has failed to explain its decision in light of its precedents, it has acted arbitrarily and capriciously in violation of G. L. c. 30A, § 14 (7) (*g*).

---

[9] As noted, the witness for the interveners recommended a 10.52% cost of equity, and the witnesses for Mass. Electric concluded that the cost of equity should be 14% to 14.9%. The Department may "[cull] from the mass of evidence those elements which ... are worthy of weight." *Boston Edison Co.* v. *Department of Pub. Utils.*, 375 Mass. 1, 12 (1978). The 12% allowed by the Department for the cost of equity was well within the range of the figures arrived at by these experts.

The test of discrimination in a commercial regulatory context is similar under both the United States and Massachusetts Constitutions. The Department's action will be accorded all rational inferences of regularity and accuracy. The party challenging the action must affirmatively show that no factual situation can be conceived that will support the reasonableness of the differential treatment of like entities. See *Paro* v. *Longwood Hosp.*, 373 Mass. 645, 650 (1977); *New Orleans* v. *Dukes*, 427 U.S. 297 (1976). Since Mass. Electric has not attempted to make such a showing, it has failed to satisfy its burden of demonstrating unconstitutional discrimination.

Mass. Electric's argument that the Department's failure to explain the differences in the rates of return constitutes arbitrary and capricious action is also not persuasive. While the Department has a statutory duty to provide reasons for its decision in a particular case, G. L. c. 30A, § 11 (8), in general it does not have the duty to explain why the result in a particular case is different from the result in another case; rather, the reasons provided for each decision should serve the function of distinguishing the cases. The reasons provided by the Department must warrant the conclusions reached; any particularized claim that the Department is using inconsistent approaches can be evaluated when the determination whether the reasons warrant the conclusions is made. See *Boston Gas Co.* v. *Department of Pub. Utils.*, 368 Mass. 780 (1975); *Boston Gas Co.* v. *Department of Pub. Utils.*, 367 Mass. 92, 103-105 (1975). We have reviewed the Department's reasons in this case and have concluded that they are supported by substantial evidence and that they warrant the Department's conclusion concerning the return on equity. Thus the Department's failure to explain why it reached different conclusions concerning cost of equity in other electric utility cases was not arbitrary and capricious.

The case is remanded to the county court where a judgment is to be entered affirming the decision, order, and rulings of the Department.

*So ordered.*