BROCKTON EDISON COMPANY *vs.* DEPARTMENT OF
PUBLIC UTILITIES & another.

Suffolk.   October 4, 1979. — January 31, 1980.

Present: HENNESSEY, C.J., BRAUCHER, KAPLAN, LIACOS, & ABRAMS, JJ.

*Public Utilities,* Allocation of interest expense, Rate of return.

In a proceeding before the Department of Public Utilities on a proposed
rate increase by an electric company, it was within the discretion of
the department to allocate interest expense between the company and
a generating subsidiary on the basis of the ratio of the company's pre-
tax income to that of the income of the company and the subsidiary
taken together rather than on a rate base formula [667-668]; however,
the case was remanded to the department for corrective action where
there appeared to be an error in calculation [668-669].

In a proceeding before the Department of Public Utilities on a proposed
rate increase by an electric company, the department was warranted
in rejecting the analysis presented by the only witness on the issue of
rate of return, in concluding that the company had not borne its
burden of proving a higher cost, and in maintaining the rate of return
at 12.5 per cent. [669-671]

CIVIL ACTION commenced in the Supreme Judicial Court
for the county of Suffolk on July 16, 1979.

The case was reported by *Abrams,* J.

*Robert G. Bleakney, Jr. (David A. Fazzone* with him) for
the plaintiff.

*Terence P. O'Malley,* Assistant Attorney General, for the
defendant.

BRAUCHER, J.   Pursuant to G. L. c. 25, § 5, Brockton Edi-
son Company (company) appeals from a decision of the De-
partment of Public Utilities (department) disallowing filed
rate increases.   The company claims error in the allocation
of some $3.1 million as an interest deduction for tax pur-
poses and in the allowance of only 12.5 per cent for return

on common equity capital. We affirm the decision of the department, and deny the company's motion for a stay.

On December 15, 1978, the company filed revised rate schedules, to become effective January 1, 1979, designed to increase annual revenues by $2,099,481. On December 21, 1978, the department suspended the filing until July 1, 1979. After thirteen days of public hearings, in which the staff of the department and the Attorney General (interveners) participated actively, the department issued its decision on June 28, 1979, disallowing the proposed rate increase in its entirety. A single justice of this court reserved and reported the case to the full court, together with the company's motion for a stay of the department's orders.

1. *Interest deduction.* The company and two other retail distributors of electricity are subsidiaries of Eastern Utilities Associates (EUA). The three retail subsidiaries purchase their power from the system's generating subsidiary, Montaup Electric Company (Montaup). The company owns about ninety per cent of Montaup and functions as the sole source of capital for Montaup, borrowing money both for its own operations and for Montaup. EUA is subject to the jurisdiction of the Securities and Exchange Commission under the Public Utility Holding Company Act; Montaup is regulated by the Federal Energy Regulatory Commission; one retail subsidiary operates in Rhode Island, and the company and the third retail subsidiary are subject to regulation by the department. The company's income from Montaup and its investment in Montaup were excluded from the rate calculations in the present case. The company's total capitalization, consisting of long-term debt, preferred stock and common equity, is over $178 million, more than four times the retail rate base of $44 million.

EUA files Federal income tax returns on a consolidated basis, covering all its subsidiaries. The company also files Massachusetts franchise tax returns. It is common ground that the company's revenue needs include funds to pay the income and franchise taxes attributable to its retail operations, that adjustments must be made to reflect tax savings

resulting from consolidation, and that interest paid by the company to persons outside the EUA system is deductible in computing income and franchise taxes. It is also common ground that the company paid out $6,930,183 in deductible interest in the test year, and that some portion of that amount must be attributed to Montaup and excluded from the calculation of taxes attributable to the company's retail operations. As more interest is attributed to those retail operations, less taxes are so attributed and hence the company's revenue needs are less and the rates to be allowed are lower. See *Boston Edison Co.* v. *Department of Pub. Utils.*, 375 Mass. 1, 38, appeal dismissed, 439 U.S. 921 (1978). Thus it is the company's interest to maximize the interest attributed to Montaup and to minimize the interest attributed to the retail operations.

The matter in dispute is the method to be used to allocate interest between Montaup and the company's retail operations. In the company's last previous rate case, it urged that the amount allocated to retail operations be the product of its embedded cost percentage for long-term debt times the retail rate base; in other words, the retail operations would bear the same amount of interest expense allowed as a revenue need. The Attorney General urged that all the interest be attributed to the retail operations, but apparently did not take into account offsetting interest received by the company from Montaup. The department rejected both contentions, and "allocated Brockton's long-term interest expense on the basis of the ratio of Brockton's pre-tax income to that of Brockton and Montaup taken together."

In the present case the company presented its treasurer as the sole witness on this dispute, and again urged that the rate base allocation be used instead of the income ratio. The treasurer's computation had internal consistency and persuasive force, and it would undoubtedly be proper for the department to adopt it. It would attribute to the retail operations an interest deduction for tax purposes of $1,949,320, the same amount allowed as revenue needed to cover embedded cost of debt. The allocation would be con-

sistent with similar allocations approved by other tribunals in a variety of contexts. See *New England Tel. & Tel. Co. v. Public Utils. Comm'n*, 390 A.2d 8, 25-30 (Me. 1978), and cases cited; 1 A. Priest, Principles of Public Utility Regulation 54-59 (1969). It would avoid anomalies which would arise if there were wide fluctuations in Montaup's income.

The department, however, rejected the company's method and adhered to the method ordered by it in the previous rate case. The allocation of taxes according to income ratio is supported by respectable precedent. In the leading case of *FPC v. United Gas Pipe Line Co.*, 386 U.S. 237, 241 n.2 (1967), the Court upheld the allocation of income taxes among subsidiaries "on the basis of their respective taxable incomes." In the present case the allocation of interest expense is used solely to calculate an adjustment of the allowance for income and franchise taxes. The use of the income ratio rather than the rate base allocation has some tendency to compensate retail rate payers for the higher cost of debt which results from borrowing to fill Montaup's capital needs in a time of inflation of interest rates. Finally, there have been no wide fluctuations of Montaup earnings such as to produce the anomalies feared by the company. Thus the department was choosing between two respectable methods of allocation. We conclude that the choice was within the scope of its regulatory discretion. See *Massachusetts Elec. Co. v. Department of Pub. Utils.*, 376 Mass. 294, 302 (1978).

The foregoing disposes of the only issue with respect to interest that has been argued to us. But our examination has disclosed what appears to be an error in calculation. If we are correct in this, the error should be corrected. Accordingly, we remand the case to the department to review the matter and take whatever corrective action it deems appropriate.

In applying its income ratio method of allocation, the department attributed 45.05 per cent of the interest expense, $3,122,047, to retail operations. From the work sheets in the record before us, the 45.05 per cent figure purports to be

a ratio of retail income to total income. But the retail income figure is arrived at by deducting interest of $1,858,377, less than 27 per cent of total interest expense. Apparently the figure of $1,858,377 is the product of the embedded cost percentage for long-term debt times the rate base. This seems internally inconsistent. A rough computation, allocating interest expense according to income ratio throughout, suggests that the income ratio figure should be 38.34 per cent instead of 45.05 and that the interest expense allocated to retail operations would be $2,657,032. The department is to confirm or revise these figures on remand and to take whatever further steps are appropriate if a correction discloses a revenue deficiency.

2. *Cost of common equity capital.* Since 1970 the company has been allowed 12.5 per cent as the rate of return on the portion of its rate base represented by common stock. In the present case, for the third time, the company sought an increase in the rate of return. It presented the only witness on the subject, and has concluded that the proper figure was no less than 14 to 14.5 per cent. The department analyzed the testimony and rejected most of the analysis made by the witness. It concluded that the company had not borne its burden of proving a higher cost, and maintained the rate of return at 12.5 per cent.

The witness testified that the "persistently weak financial standing" of the company triggered a downgrading of its bonds by Standard & Poor's in 1978 from "A" ("upper medium grade") to "BBB" ("medium grade . . . borderline between definitely sound obligations and those where the speculative element begins to predominate"). The downgrading was unusual because it was not made on the occasion of a new offering. Moreover, EUA, the parent company and the sole source of common equity capital for the company, had made four successive offerings of common stock and realized substantially less than book value each time. The witness also presented a historical analysis of the market for utilities and other stocks, including analysis of Moody's 24 utilities and a second group of eleven utilities

selected as comparable to the company. He presented two "discounted cash flow" (DCF) analyses, one on EUA as a surrogate for the company and one on a selected group of six utilities. Finally, he checked his results by computing "coverage ratios". (ratios of pre-tax and after tax income available to pay fixed charges).

Since the company claims confiscation, we have reviewed independently both law and facts. See *Massachusetts Elec. Co.* v. *Department of Pub. Utils.*, 376 Mass. 294, 298 n.2 (1978). But we have recently reviewed similar contentions as to cost of equity, and we see no need to repeat the lengthy discussion of very similar issues in those cases. *Id.* at 298-309. *Fitchburg Gas & Elec. Light Co.* v. *Department of Pub. Utils.*, 375 Mass. 571, 574-578 (1978). *Boston Edison Co.* v. *Department of Pub. Utils.*, 375 Mass. 1, 9-17 (1978). Suffice it that we find that the department was fully warranted in rejecting the analyses made by the company's witness. Without those analyses the evidence to support an increase in cost of equity was suggestive rather than compelling.

We recognize, as did the witness and the department, that determination of the cost of equity is a matter of judgment, and that any method, assumption or conclusion may have shortcomings. Data for companies comparable to a wholly owned subsidiary are particularly hard to find, and price-earnings ratios and DCF cannot be applied directly. We have not wholly rejected the use of a parent as a surrogate for its subsidiary in such analyses, but we have insisted on disclosure of comparative earnings of the other subsidiaries. *Massachusetts Elec. Co.* v. *Department of Pub. Utils.*, 376 Mass. 294, 303-305 (1978). No such disclosure is made to us. The difficulty is illustrated in our review of the interest deduction: with less than one-fourth of the company's capital, the company's retail operations apparently generated well over one-third of its income. We have several times rejected any rule that a utility is automatically entitled to a rate of return that will maintain the market value of its common stock above book value. *Id.* at

308-309, and cases cited. Finally, we need not and do not find "coverage ratios" very useful without other support. *Id.* at 305.

3. *Disposition.* The order appealed from is affirmed, subject to reexamination of the calculation of the interest deduction in accordance with this opinion. The single justice is to remand the case to the department for such reexamination.

*So ordered.*