**BLACKSTONE VALLEY ELECTRIC COMPANY**

v.

**PUBLIC UTILITIES COMMISSION et al.**

**No. 80–238–M.P.**

Supreme Court of Rhode Island.

July 14, 1982.

Tillinghast, Collins & Graham, Peter J. McGinn, Robert M. Schacht, Providence, Sullivan & Worcester, Robert G. Bleakney, Jr., David A. Fazzone, Boston, Mass., for petitioner.

Dennis J. Roberts, II, Atty. Gen., John R. McDermott, Sp. Asst. Atty. Gen., for respondents.

## OPINION

WEISBERGER, Justice.

This is a statutory petition for certiorari, wherein Blackstone Valley Electric Company (the company) seeks review of an order entered by the Public Utilities Commission (the commission) in docket Nos. 1439, 1184, and 1185, which order provided in part for the reduction of the company's rate base by the sum of $1,486,867. This reduction of rate base is the sole subject of the company's petition for certiorari. The facts underlying this dispute are as follows.

In a prior decision of the commission the company's depreciation rates had been set on March 2, 1976, at a composite rate of 2.91 percent. This rate of depreciation or amortization was applied to the total depreciable assets of the company. In preparation for the presentation of a new tariff filing made by the company in docket Nos. 1439, 1184, and 1185, Mr. Reginald R. Bird, a vice president of Stone & Webster Management Consultants, Inc., conducted a new depreciation study for the company's plant and assets in service as of December 31, 1978. This study was, in the words of the witness,

"performed to insure that the depreciation element included in the cost of service represents as accurate a measurement as is possible of the portion of the cost of the asset that is allowable to the particular accounting period, increased by a similar allocation of the estimated costs of retiring the asset, and decreased by an allocated portion of the estimated salvage to be realized on the disposal of the asset."

After taking into account an analysis of the cost of retiring assets and salvage for the period 1974–1978 and other factors, including negative salvage, Mr. Bird determined that a more accurate rate of depreciation for the remaining life of the company's plant and assets should be set at an annual composite rate of 3.16 percent. After consideration of the testimony of this witness and of supporting exhibits and prior tariff filings made by the company, the commission made the following observation concerning the proposed rate of depreciation:

"As a result of this review, we are persuaded that the Company's earnings have been deficient and that consequently it may recover the reserve deficiency through future depreciation charges. Since Mr. Bird's study employed the 'remaining life' technique which incorporates such a recovery into the depreciation rate, we find that the Company's recommendation of 3.16% is proper without adjustment."

However, having approved the new rate of depreciation, the commission then reduced the company's rate base by recalculating the reserve for depreciation as though the new rate of depreciation had been effective retroactively to and prior to previous tariffs. This resulted in a difference between the theoretical reserve for depreciation as of December 31, 1978, of $16,848,867 and the average test-year book reserve for depreciation of $15,362,000. This resulted in a "deficiency" of $1,486,687, which the commission proceeded to deduct from the rate base, thereby reducing the rate base upon which return on investment to the company

would be calculated. The company argues that this reduction was not supported by legally competent evidence. We agree.

The sole evidence upon which the new rate of depreciation was based came from the testimony of Mr. Bird. Mr. Bird stated without equivocation in respect to the theoretical reserve:

"This theoretical reserve cannot be used for anything other than to say that it is the reserve requirement that you need today if all these assumptions that have been incorporated in this study are valid and were valid from the first day the company came into being, and this is completely impossible."

In commenting further upon the significance of the theoretical reserve, Mr. Bird stated in response to questions on cross-examination:

"I wanted to make sure that it is clearly understood that that number is strictly a theoretical number, because it is computed based on the assumptions that are made in this study, and [dis]regards completely any assumptions that were made in any other study or any other data which was concluded.

"For instance, if a previous study had concluded that a life was to be 50 years, the study was performed on the basis of statistical data and 50 years was proven, let's say it was justified, before a Commission. Now, 10 years later, * * * a second or third study is performed. It turns out that the life is 40 years based upon the statistical data which was developed over the last 10 years. When you make a theoretical reserve requirement, you make the assumption that the 40 years has been in existence from the Day 1, and therefore, the accruals to the account should have been at the rate of two and a half percent as opposed to two percent, * * * then say you have a [de]ficiency from the reserve because you don't have enough in there to equal the two and a half percent rate, and nothing can be further from the truth that you can't take today's knowledge and say that you should have possessed with that [sic] 20 or

30 years ago. * * * The salvage plays an important role in this calculation."

The purport of Mr. Bird's testimony leads only to one conclusion, namely, that the theoretical reserve figure should not be used for any purpose in calculating rate base since the company cannot be chargeable with data and information which were unobtainable at the time when prior assumptions regarding useful life and salvage value were made.

The only additional witness who commented upon the significance of the theoretical reserve was Mr. Aarne Hartikka, an expert witness presented by the Division of Public Utilities and Carriers (the division). Mr. Hartikka was specifically asked upon cross-examination about the propriety of removal of a theoretical deficiency from the rate base. His response was as follows:

"I considered it. My own view is that the general rule should be that the correct rate base deduction is the book reserve because the book reserve expresses the extent to which invested capital has in fact been recouped from ratepayers via the depreciation charges over time, and that is what the ratepayers are entitled to have recognized in the rate base determination. I understand that that is the general rule, but there are also some exceptions to the general rule. For example, it's been said, I think in Pennsylvania, that where a reserve deficiency can be shown to result from management nonfeasance, that is, where the company has simply neglected to provide sufficient depreciation in the past and therefore has permitted a deficiency to develop, that the theoretical reserve should nevertheless be deducted. On the theory when provisions for depreciation were insufficient to maintain an adequate reserve, there were excess earnings returned to investors, and so that then to deduct the theoretical reserve merely corrects a prior inequity, *but I did not have any basis for determining that those facts justified a departure from the general rule in this case.*" (Emphasis added.)

Later, in supplemental testimony, Mr. Hartikka stated that the burden of demonstrating that excess earnings did not occur during the period in which the deficiency arose should be on the company. We believe the company has met this burden.

An analysis of the total testimony in the case and the findings of the commission thereon indicates that there is no evidence upon which a finding of either negligence or excessive earnings on the part of the company could be based. Mr. Hartikka suggested that there was no basis for such a finding in this case. Indeed, the commission thus was persuaded "that the Company's earnings have been deficient" as opposed to excessive. As a consequence, we are of the opinion that the instant case is indistinguishable from that of *Providence Gas Co. v. Burke*, R.I., 419 A.2d 263, 268 (1980), in which we observed that a deduction of a theoretical "deficiency" from the rate base in effect "was confiscatory." Our analysis in that case might be summarized by the following comments:

> "Having previously approved a revised depreciation rate in an order from which no appeal was taken, and having found in essence that the company had not recovered the costs represented by the deficiency in its book account in any other way, the commission would be acting confiscatorily to remove this so-called deficiency from the rate base, thereby penalizing the company for its lack of precise clairvoyance." *Id.* 429 A.2d at 267–68.

Most recently we confirmed and reasserted the foregoing principles in *Valley Gas v. Burke*, 446 A.2d 1024 (R.I.1982).

The same analysis is controlling in the case at bar. This company is no more subject to being penalized for lack of precise clairvoyance than was the Providence Gas Company. As a consequence, the commission erred as a matter of law in reducing the rate base by the sum of $1,486,867.

For the reasons heretofore stated, the petition for certiorari is granted insofar as the commission has purported to reduce the company's rate base by the sum of $1,486,-867. That portion of the commission's report and order is hereby quashed. The records certified to this court are ordered returned to the commission with the direction that it adjust the tariff rates sought by the company to reflect the inclusion of this sum in the rate base.