INTERSTATE NAVIGATION CO.

v.

Edward F. BURKE et al.

No. 82–258–M.P.

Supreme Court of Rhode Island.

Aug. 30, 1983.

W. Slater Allen, Jr., Booth & Brodsky, Providence, for petitioner.

Richard E. Crowell, Jr., Public Utilities Commission, Cranston, for respondents.

## OPINION

WEISBERGER, Justice.

This is a statutory petition for certiorari filed by the Interstate Navigation Company (the company or Interstate) pursuant to G.L.1956 (1977 Reenactment) § 39–5–1. The company challenges the May 14, 1981 decision and interim order of the Public Utilities Commission (the commission) and the final report and order that the commission rendered on May 28, 1982. Both of these orders addressed the proposed tariff that the company filed with the commission on February 24, 1981, in docket No. 1572. In its petition the company contends that the commission erred in several respects when it twice denied the company's request for rate relief. The pertinent facts are as follows.

Interstate runs a ferry service between points on the mainland and Block Island.

Prior to filing the proposed tariff, the company contracted for the construction of a new ship, the *Nelseco II* (the *Nelseco*), which would be added to a fleet comprised of the *Quonset,* the *Manisee,* the *Manitou* and the *Yankee.* The company intended to route all of these vessels, except for the *Yankee,* between Point Judith and Block Island during the summer of 1981.

The company's proposed tariff reflected a rate increase in the amount of $179,078. The company estimated that its expenses for fuel and wages would increase significantly in 1981. In addition, the company sought rate relief for interest and depreciation expenses that the company would incur during 1981 because of the addition of the *Nelseco* to the company's fleet.

Public hearings were held on April 6, 1981, at the offices of the commission and on May 11, 1981, at the New Shoreham Town Hall. At these hearings, the Division of Public Utilities and Carriers (the division) opposed the company's proposed rate increase and offered evidence to rebut the company's projected increases for 1981 in fuel, payroll, interest, and depreciation expenses. The division suggested that the company was entitled to a rate increase of $76,538.

The commission rendered its decision and interim order in docket No. 1572 on May 14, 1981. The commission allowed Interstate increases in fuel and payroll expenses in amounts lower than those that the company had requested but higher than those that the division had proposed. The May 14 decision fully resolved these issues. The company's request for rate relief in respect to the expenses attributable to the *Nelseco,* however, posed questions that were not fully adjudicated.

Noting that the *Nelseco* was not in service during the test year (1980), the commission determined that it could include the ship's depreciation and interest expenses in the revised tariff only if "the charges are known and measurable for the twelve months ended [sic] December 31, 1981." After reviewing the company's justification for including these expenses in the proposed tariff, the commission disallowed them because they were not known and measurable on May 14, 1981. More specifically, the commission held that

"the costs of completing and outfitting the Nelseco II are too speculative at this time but should be reviewed in the near future. * * * We do believe, however, that it will be in the public interest to place the Nelseco II in service and to afford it proper rate treatment as soon as possible.

"Most importantly * * * the Commission feels that it cannot approve some changes without considering all possible revenue increases and expense savings. Therefore, the Commission agrees with the Division and will disallow these expenses until a later time when they are known and measurable."

The commission therefore issued only an interim order regarding rate relief for the depreciation and interest expenses of the *Nelseco.*

This order instructed the company to file, no later than September 30, 1981, a complete report of expenses and revenue for the period from January 1, 1981, to September 7, 1981. The commission specified that this report should itemize all expenses for constructing and outfitting the *Nelseco* and should analyze the most efficient use of the company's vessels for service to Block Island.

The commission awarded Interstate a rate increase of $105,637, which was well below the company's proposed tariff. The final issue that the commission addressed was the company's proposed rate design. Although the division had not disputed the company's plan, the commission ordered the company to apply the rate increase to all categories of passenger-related rates equally. Moreover, motivated by a concern that cargo rates might be unfairly subsidized by passenger-related rates, the commission instructed the company to conduct a cargo rate study, which the company was to file

by September 30, 1981, with its 1981 revenue and expense report.

After a continuance, the company filed a report with the commission on October 15, 1981. This report supplied data concerning revenue and expenses for the period January 1, 1981, through September 7, 1981. A balance sheet that was dated September 7, 1981 accompanied the report. However, the company did not file the cargo rate study that the commission had requested in its interim order.

On November 4, 1981, Interstate notified the commission that the company was seeking a rate increase of $73,441 through further proceedings in docket No. 1572. Further, the company asserted that the requested cargo rate study was not feasible. Accordingly, the company requested that the remaining issues be resolved and that the study be deferred to a future docket.

The commission held the first hearing on the company's requests on March 1, 1982. This hearing dealt solely with the company's failure to conduct the cargo rate study. Citing the difficulty of conducting such a study during the off season, the company suggested that it be allowed to defer completion of the study until after the expenses for *Nelseco* were given appropriate rate treatment. The division, on the other hand, interpreted the May 14, 1981 interim order of the commission as requiring the cargo rate study's completion prior to further proceedings in docket No. 1572. The commission disagreed. Rather, it ordered the division to conduct an audit of Interstate to facilitate the resolution of the remaining issues in the case. The commission, however, instructed the company to complete the cargo rate study prior to any requests for rate relief in future dockets.

Further hearings were held on April 1, 1982, and on April 16, 1982. As they had done in the spring of 1981, representatives of Interstate testified at these hearings in support of the company's request for rate relief. Similarly, representatives of the division urged the commission to grant no relief to the company for the depreciation and interest expenses attributable to the *Nelseco*, which started service on the Block Island run on or about July 1, 1981.

The April 1982 hearings disclosed the following evidence.[1] According to the company, the interest expense for the *Nelseco* in 1981 equaled $87,500, and the ship's depreciation expense for the same period was $24,500. Although the sum of these figures was $112,000, Interstate felt constrained by the previous proceedings in docket No. 1572. The company therefore requested only $73,441 in rate relief, which represented the difference between the original proposed tariff and the rate increase that the commission had awarded on May 14, 1981.

The division, on the other hand, proposed to allow the company $44,265 in interest expense and $4,500 for depreciation but would offset these costs by revenue increases of $207,619 that were attributable to the *Nelseco's* operation during the summer of 1981. Accordingly, the division recommended to the commission a zero increase in rates.

Raymond Linda, general manager of Interstate, admitted that the *Nelseco* generated extra revenue but could not specify the amount because canceled tickets for the various ships were burned after collection. John G. Kanabis, the company's certified public accountant, verified that the company did not segregate passenger revenue on a vessel-by-vessel basis. Mr. Kanabis attributed the increase in passenger revenue to the *Nelseco's* operation and to the increased popularity of Block Island with summer tourists.

The division presented James I. Goldman, a certified public accountant, as an expert witness. He had been retained by the division to conduct a cost-benefit analysis in

---

1. In addition to presenting witnesses at these hearings, both the division and Interstate introduced prefiled testimony into evidence. For the sake of clarity and convenience, we shall incorporate information derived from both sources when reviewing the relevant testimony of the witnesses.

regard to the company's addition of the *Nelseco.* Mr. Goldman ascertained the costs and expenses that the company incurred because of the new vessel and determined what benefits the company derived from the use of the ship in the areas of labor and fuel costs. In addition, Mr. Goldman allocated total passenger revenue among all of Interstate's vessels, except for the *Yankee,* relying on a comparison of the total passenger capacity of each vessel to the total passenger capacity of all vessels for the period the ships were in operation. This formula resulted in Mr. Goldman's concluding that passenger revenue attributable to the *Nelseco* during the summer of 1981 amounted to $220,599.

The commission rendered its final report and order in docket No. 1572 on May 28, 1982. First, the commission interpreted the portion of the interim order in which the commission had held that it could not approve rate relief for the charges attributable to the *Nelseco* without considering revenue increases and expense savings that the vessel might produce. The commission posited that by "revenue increases and expense savings" it had meant "the extra revenues generated as a result of the Nelseco II being put in service and any possible expense savings which may have evolved as a result of using the Nelseco II rather than one of the less efficient boats."

Next, the commission noted that the company had not contested the division's assertion that the *Nelseco* had generated extra revenue. The commission rejected Interstate's claim that the destruction of canceled tickets prevented the company from calculating precisely the amount of increased revenue attributable to the *Nelseco.* Consequently, the commission held that

"[s]ince the Company totally failed to meet its burden of proof by supplying adequate information relating to revenue offsets and expense savings * * * it would be imprudent * * * to approve any additional charges absent the necessary offsets."

The commission therefore denied and dismissed Interstate's request for rate relief and instructed the company to file a complete rate case if, in the future, the company determines that revenue increases are not offsetting additional expenses. The commission further ordered Interstate to supply a cargo rate study prior to any future rate filing. The company filed a petition for certiorari with this court on June 4, 1982. The writ issued and was returned before the specified date.

In its brief the company raises issues that relate to the commission's findings in both the May 1981 decision and interim order and the May 1982 final report and order. Before we specify the issues that we shall address, we must consider the commission's contention that Interstate's noncompliance with the provision of § 39–5–1 renders the commission's interim order nonreviewable at this time.

Section 39–5–1, which authorizes judicial review in public utilities cases, provides:

"Any person aggrieved by a decision or order of the commission may, *within seven (7) days from the date of such decision or order,* petition the supreme court for a writ of certiorari to review the legality and reasonableness of said decision or order. The petition for a writ of certiorari shall fully set forth the specific reasons for which it is claimed that the decision or order is unlawful or unreasonable. Chapter 35 of title 42 shall not be applicable to appeals from the commission. *The procedure established by this chapter shall constitute the exclusive remedy for persons and companies aggrieved by any order or judgment of the commission;* provided, however, any person aggrieved by a final decision or order of the administrator may appeal therefrom to the superior court pursuant to the provisions of § 42–35–15." (Emphasis added.)

Although the company filed its petition for certiorari within seven days of the commission's final order in docket No. 1572, the filing date was more than a year later than the date of the commission's interim order.

Contending that the interim order was not appealable, the company cites *Boston Gas Co. v. Department of Public Utilities,* 368 Mass. 780, 336 N.E.2d 713 (1975). In that case the Massachusetts Supreme Judicial Court interpreted the state's counterpart to G.L. § 39–5–1. Unlike our statute, the Massachusetts statute authorizes appeals "from any *final* decision, order or ruling of the commission * * *." Mass.Gen.Laws Ann. ch. 25, § 5 (West 1981). (Emphasis added.)

■ Section 39–5–1, on the other hand, refers to finality only in respect to an aggrieved party's ability to appeal a final order or decision of the administrator of the division pursuant to section 15 of chapter 35 of title 42, which chapter embodies the Administrative Procedures Act. Moreover, § 39–5–1 expressly excludes the applicability of all provisions of the Administrative Procedures Act, including § 42–35–15, to appeals from the commission. *Providence Gas Co. v. Burke,* 119 R.I. 487, 502 n. 5, 380 A.2d 1334, 1342 n. 5 (1977). The Legislature therefore intended that all decisions and orders of the commission be appealable to this court through petitions for certiorari.

■ We are of the opinion that all of the findings contained in the commission's decision and interim order were appealable on May 14, 1981.[2] Consequently, Interstate's failure to petition for a writ of certiorari within seven days of that date, as required by § 39–5–1, renders these findings nonreviewable. Accordingly, we dismiss the company's petition to review the commission's decision and interim order. We shall address only those issues that relate to the report and order of May 28, 1982.

■ The role of this court in reviewing findings of the commission is clearly defined by statute and case law. *See e.g., New England Telephone & Telegraph Co. v. Public Utilities Commission,* R.I., 446 A.2d 1376, 1380 (1982); *Valley Gas Co. v. Burke,* R.I., 406 A.2d 366, 369 (1979); *Michaelson v. New England Telephone & Telegraph Co.,* 121 R.I. 722, 728, 404 A.2d 799, 803 (1979); G.L.1956 (1977 Reenactment) § 39–5–3. The commission engages in factfinding; we do not. Instead, we determine whether the commission's findings are lawful and reasonable, fairly and substantially supported by legal evidence, and sufficiently specific to enable us to ascertain if the evidence upon which the commission based its findings reasonably supports the result. *Blackstone Valley Chamber of Commerce v. Public Utilities Commission,* 121 R.I. 122, 128, 396 A.2d 102, 105 (1979). Applying these standards, we now consider the contentions of the company which relate to the commission's final report and order.

I

*Disallowance of Interest and Depreciation Expenses Attributable to the Nelseco II Because of Revenue Offsets*

The company contends that the *Nelseco's* expenses warranted rate relief because there was no nexus between the ship's being placed into service and the increase in revenue that the company realized during 1981. According to Interstate, delays caused by long passenger lines had plagued the Block Island run in the past. The company used the *Nelseco* between Block Island and existing terminals that had suffered from these delays. The company asserts, therefore, that the *Nelseco* did not generate

---

2. Even if we were to interpret G.L.1956 (1977 Reenactment) § 39–5–1 as requiring finality, we believe that several findings that the commission set forth in its decision and interim order were final and appealable on May 14, 1981. We need not specify these findings or address, for the sake of argument, their validity because the company failed to comply with § 39–5–1. We note, however, that the May 14, 1981 findings of the commission prospectively addressed the company's financial situation. The May 28, 1982 final report and order, on the other hand, dealt with circumstances as they actually developed during the summer of 1981. At this juncture, therefore, it would be confusing and quite possibly futile for this court to review findings that have been rendered nugatory through the passage of time, changed circumstances, and a subsequent report and order of the commission.

any new revenue, as it might have done had the company used the vessel between Block Island and newly established terminals.

We find this contention perplexing in light of Mr. Linda's admission that the *Nelseco* had generated new revenue for the company. In its brief, the company explains this inconsistency by claiming that the *Nelseco,* along with the company's other vessels, was used to transport an unexpected increase in the company's passenger pool as well as passengers in what the company characterizes as the "basic pool." The company suggests to this court, therefore, that Mr. Linda meant that all of the vessels generated new revenue.

We are of the opinion that our acceptance of this line of reasoning would have no effect upon the disposition of the company's petition. Even if all of the vessels in Interstate's fleet, rather than only the *Nelseco,* generated new revenue during 1981, our review would still focus on the commission's finding that those revenues attributable to the *Nelseco* offset the ship's interest and depreciation expenses. Our determination of the validity of this finding, in turn, is affected by the legitimacy of two contentions that the company has set forth: (1) the nexus argument, to which we have already referred, and (2) the contention that Mr. Goldman's formula for allocating increased revenue among the company's ships was hypothetical and, as such, constituted illegal, incompetent evidence that the commission should have disregarded. If we accept the company's challenge to the evidence adduced through Mr. Goldman's testimony, we must reverse the report and order of May 28, 1982, because the commission's disallowance of rate relief for the *Nelseco's* expenses was based solely upon this evidence.

Prior to considering this issue, however, we must make clear that we find the company's nexus argument unpersuasive. Interstate seems to suggest that a capital investment, such as a new vessel, must service customers to whom a company had never previously offered service for that investment to generate new revenue. In this case, the general manager of Interstate attributed the growth in revenue during 1981, in part, to an upsurge in the popularity of Block Island with summer tourists. If the company had not placed the *Nelseco* in service during the summer of 1981, it is quite likely that the company's fleet would have been incapable of adequately handling the increased demand for passenger space. Other palliatives, such as additional trips to the island, would probably have failed to meet the need. Consequently, the company would have lost revenue that it would have realized had the *Nelseco* been placed in service. It is therefore illogical to contend that no connection exists between the *Nelseco* and increased passenger revenue. In any event, it should be noted that an application for rate relief must be based upon the total revenues and expenses of the company. In arriving at a determination of revenue offsets to expenses, the experience of a particular vessel is of interest and may well be a significant factor in the determination. It is not, however, the only factor or indeed even a *sine qua non* in the determination of entitlement to the privilege of charging higher fares to customers. Such a determination should be made, as it was made in this case, on the basis of the total income and expense statement for the relevant period.[3] Accordingly, the sole issue before us is whether the commission's decision in respect to the denial of rate relief was based upon legally competent evidence relating to income and expenses of the company.

Mr. Goldman was retained by the division to conduct a financial review of Interstate based upon income statements and other information that the company supplied. This review was intended to result in a determination of whether increases in passenger revenue attributable to the *Nelseco* offset the ship's depreciation and interest expenses. He visited the company's office

---

**3.** *See* note 7 *infra.*

in New London, Connecticut, and met with officers of the company. During the course of his analysis, Mr. Goldman learned from Mr. John Kanabis, the company's general manager, that passenger revenue was not segregated by vessel, except for the *Yankee*.[4] According to Mr. Goldman's report and his prefiled testimony he therefore developed a formula for allocating passenger revenue among the various ships, after discussing the reasonableness of the formula with Mr. Kanabis. Mr. Goldman allocated total passenger revenue for the period January 1, 1981, to September 7, 1981, among the *Manitou,* the *Manisee,* the *Quonset* and the *Nelseco* by comparing each vessel's prorata share of passenger capacity with the total passenger capacity of all of the vessels and applying that ratio to total passenger revenues. He applied the same formula to the entire year 1981.[5] This procedure resulted in a determination that the company's total passenger revenue increased by $194,228 from 1980 to 1981. According to the allocation formula, the company realized $226,942 in passenger revenue during 1981 from the operation of the *Nelseco*.[6] This entire amount represented an increase in revenue because the *Nelseco* was not in service during 1980. Of the total amount of passenger revenue that the *Nelseco* generated during 1981, Mr. Goldman calculated that the ship generated $220,599 between January 1, 1981, and September 7, 1981.

Mr. Goldman suggested that the commission apply this entire amount to offset the *Nelseco's* expenses. The division adopted this theory but, in the alternative, proposed that the commission apply a revenue offset of $207,619. The reason for this strategy was as follows. The company's income statement for the years 1979 through 1981, which the company filed prior to the end of 1981, projected an increase in expenses for the company from 1980 to 1981 in the amount of $334,307.[7] Mr. Goldman's financial review, however, indicated that the expense increase was $311,519.[8] This discrepancy resulted from adjustments that Mr. Goldman made to the company's overall interest and depreciation expense for 1981. In a memorandum filed with the commission, the division suggested that the company's 1981 expense figure was too high but addressed the commission's possible acceptance of the figure and the effect of that acceptance on the revenue offset attributable to the *Nelseco*.

First, the division calculated, relying on the product of the number of vessels and the number of months they were in service during 1981, a total of fifty-four vessel/months during 1981.[9] Next, since the period in question (July 1 to September 7) was only 2.5 months, or 4.1 percent of fifty-four, the division determined that 4.1 percent of the company's 1981 expense increase was attributable to the *Nelseco* during the relevant period. The division therefore purported to apply the percentage to the expense-increase figure that the company had set forth and to reduce the division's revenue offset by this amount.

A reapplication of this formula reveals that the division made some minor mistakes when calculating the adjusted revenue off-

---

4. The company recorded the *Yankee's* passenger revenue separately because it originated from a different terminal than the other vessels.

5. Mr. Goldman's breakdown of passenger revenue appears as Appendix A to this opinion.

6. The passenger revenue attributable to the *Nelseco* during 1981 exceeds the overall increase for 1981 because several of the company's other ships generated less revenue during 1981 than they had during 1980.

7. Appendix B is the company's income-statement comparison of the years 1979 through

1981. It should be noted that operating income increased from 1980 to 1981.

8. We have denoted as Appendix C Mr. Goldman's version of the company's 1981 income statement. Mr. Goldman's statement shows a greater net operating income than does the company's statement in Appendix B.

9. Four of the company's vessels were in service for twelve months during 1981, but the *Nelseco* operated for the last six months of the year only.

set. We believe however that these miscalculations are not prejudicial to the company. Even though the commission ultimately adopted the division's version of the adjusted revenue offset, an application of more accurate calculations regarding the revenue offset would have led the commission to the same result; the revised figure would still far exceed the company's request for rate relief in the amount of $73,441.

After reviewing all of the evidence presented to the commission, we are of the opinion that the commission's finding of a revenue offset in this case was lawful, reasonable, and substantially supported by legally competent evidence. Mr. Goldman's formula for allocating the increased revenue among the ships was reasonable and fair to the company. Interstate, after all, made absolutely no attempt to comply with the commission's request for data concerning expense savings and revenue increases specifically attributable to the Nelseco. As the party seeking rate relief, the company had the burden of establishing its entitlement to such relief. General Laws § 39-3-12; see Providence Gas Co. v. Burke, R.I., 419 A.2d 263, 266 (1980); Valley Gas Co. v. Burke, R.I., 406 A.2d 366, 370 (1979); Michaelson v. New England Telephone & Telegraph Co., 121 R.I. at 734, 404 A.2d at 806; see also United States v. Public Utilities Commission, 120 R.I. 959, 963, 393 A.2d 1092, 1094 (1978) (by enacting § 39-3-12 the Legislature has recognized the "general principle that a moving party must prove its case").

Moreover, there is no merit to the company's implicit comparison of Mr. Goldman's revenue allocation formula to the deduction of a "theoretical deficiency" from the rate base, resulting from a retroactive application of a new rate of depreciation, which practice we most recently invalidated in Blackstone Valley Electric Co. v. Public Utilities Commission, R.I., 447 A.2d 1152 (1982). Mr. Goldman developed his formula after consulting with Interstate's general manager and based it upon ascertainable facts, namely, the passenger capacity of each vessel in the company's fleet during the relevant periods, the total passenger capacity of the entire fleet, the number of months that each ship was in service, and the total amount of passenger revenue that the company realized. The formula was by no means theoretical in the sense that we used that word in Blackstone Valley. Rather, it was a well-reasoned, rational method of completing a task that the company should have undertaken—that is, calculating the amount of passenger revenue attributable to the Nelseco during the summer of 1981. Accordingly, we find no error in the commission's reliance upon Mr. Goldman's testimony.

II

*The Absence from the Commission's May 28, 1982 Report and Order of Any Reference to Testimony Regarding Nonrecurring Items of Income*

We decline to address the company's argument in respect to this issue because it does not relate to this docket. From the outset, the commission addressed a claim for rate relief in docket No. 1572 which was based solely upon the company's addition of the Nelseco to its fleet. The commission's interim order left the docket open only in respect to the Nelseco. Although the company was free, absent objection, to introduce irrelevant evidence, the commission properly ignored the company's assertions regarding nonrecurring items of income.

III

*Due Process Issues*

As its final claim the company asserts that the commission deprived it of procedural due process during the travel of docket No. 1572 because the commission (1) rendered a nonappealable order on May 14, 1981, (2) delayed resolution of the company's request for rate relief unreasonably, (3) lacked appropriate standards for addressing

the company's request and, without warning, deviated from standards that it had previously applied to regulate the company, and (4) failed to undertake its duties with expertise. The company's first point is controlled by our finding that the May 14, 1981 decision and interim order was appealable. As for the other contentions, they do not warrant lengthy discussion because they are wholly without merit.

■ A review of the record in this case indicates that the commission complied with its own rules of practice and procedure and with the provisions of the Administrative Procedures Act.[10] Any delays that resulted were not unreasonable and were caused, in part, by the company's failure to appeal the May 14, 1981 decision and interim order and to comply with the commission's data requests. The commission, under the circumstances, acted expeditiously in resolving the company's claim for rate relief.

■ Finally, the company's challenge to the commission's standard and level of expertise is untenable. By accepting the testimony of the division's expert witness, the commission .acted fairly and professionally. Furthermore, the company was well aware, as of May 14, 1981, of the standards that the commission would apply when determining whether the *Nelseco's* interest and depreciation expense should be afforded rate relief.

## IV

### *The Motion to Dismiss*

On March 16, 1983, the commission filed a motion to dismiss further proceedings before this court in respect to the company's petition. We deferred action on the motion to dismiss because, since the date for oral argument in this case was imminent, the commission could raise at oral argument the contentions that formed the basis of the motion.

It is unnecessary for us to review these contentions or to address their validity because they are rendered moot by the determinations that we have set forth today: (1) the decision and interim order was appealable and the company's noncompliance with proper appellate procedure rendered the findings contained therein nonreviewable; (2) the findings of the commission on May 28, 1982, were valid; and (3) the company's claim that the commission's lack of expertise and adequate regulatory guidelines deprived the company of procedural due process was without merit. Consequently, we deny the motion to dismiss without further discussion.

## V

### *Conclusion*

For the reasons stated, the company's petition for certiorari is denied and dismissed. The writ heretofore issued is quashed. The records certified to this court are remanded to the commission with our decision endorsed thereon.

---

**10.** The notice and hearing requirements of the Administrative Procedures Act apply to all "contested cases" before the commission. *Providence Gas Co. v. Burke,* 119 R.I. 487, 502, 380 A.2d 1334, 1342 (1977); *see* G.L.1956 (1977 Reenactment) § 42–35–1. These requirements are set forth in § 42–35–9, as amended by P.L. 1979, ch. 370, § 1, and P.L.1981, ch. 424, § 1.

## APPENDIX A

### INTERSTATE NAVIGATION COMPANY
### PASSENGER REVENUE

| FOR THE PERIOD | TOTAL | YANKEE | MANITOU | MANISEE | QUONSET | NELSECO II |
|---|---|---|---|---|---|---|
| January 1, 1981, to September 7, 1981 | $825,629 | $76,040 | $205,899 | $205,899 | $117,192 | $220,599 |
| January 1, 1981, to December 31, 1981 | $936,095 | $76,323 | $242,014 | $270,254 | $120,562 | $226,942 |
| January 1, 1980, to December 31, 1980 | $741,867 | $98,263 | $260,486 | $209,887 | $173,231 | – – – |

## APPENDIX B

### INTERSTATE NAVIGATION CO., INC.
### INCOME STATEMENT FOR THE YEARS
### 1981 – 1980 – 1979

|  | 1981 | 1980 | 1979 |
|---|---|---|---|
| Operating revenues | $1,448,505 | $1,105,688 | $ 937,242 |
| Operating expenses: | | | |
| Maintenance payroll | $ 75,339 | $ 56,473 | $ 39,290 |
| Maintenance expense | 139,322 | 91,669 | 135,616 |
| Depreciation | 54,697 | 36,415 | 27,123 |
| Crew payroll | 269,596 | 236,187 | 200,929 |
| Fuel | 209,096 | 156,249 | 94,911 |
| Wharfage | 28,540 | 28,280 | 30,150 |
| Supplies | 52,548 | 46,807 | 57,281 |
| Freight agents | 58,482 | 39,037 | 27,836 |
| Utilities | 17,335 | 14,883 | 12,013 |
| Vehicle expense | 10,979 | 13,864 | 9,672 |
| Other terminal expenses | 16,185 | 14,035 | 14,433 |
| Pursers | 28,141 | 19,971 | 17,337 |
| Traffic expenses | 19,705 | 19,191 | 13,574 |
| General salaries | 69,209 | 46,824 | 35,400 |
| Other general-office expenses | 53,196 | 46,726 | 26,241 |
| Insurance and casualties | 56,737 | 59,829 | 69,178 |
| Payroll taxes | 59,402 | 45,643 | 28,239 |
| Other taxes | 41,633 | 36,585 | 31,824 |
| Interest | 89,951 | 17,552 | –0– |
| Other vessel expense | 22,644 | 16,120 | –0– |
| Rate-case expenses | 6,000 | 2,000 | –0– |
| Total operating expenses | $1,378,647 | $1,044,340 | $ 871,047 |
| Operating income | $ 69,858 | $ 61,348 | $ 66,195 |

## APPENDIX C

INTERSTATE NAVIGATION COMPANY
INCOME STATEMENT
FOR THE PERIOD JANUARY 1, 1981, to DECEMBER 31, 1981

| | Per company | Adjustments | Adjusted income statement |
|---|---|---|---|
| **Revenue** | | | |
| Passengers | $ 936,095 | | $ 936,095 |
| Cars | 181,325 | | 181,325 |
| Freight | 166,803 | | 166,803 |
| Bar | 58,723 | | 58,723 |
| Bikes | 55,558 | | 55,558 |
| Charter | 27,825 | | 27,825 |
| Mail | 22,176 | | 22,176 |
| Total Revenue | $1,448,505 | | $1,448,505 |
| **Selling, administrative, and operating expenses** | | | |
| Payroll | 469,567 | | 469,567 |
| Fuel and lubrication | 216,956 | | 216,956 |
| Boat repairs | 123,590 | | 123,590 |
| Interest * | 89,951 ** | (19,954) 3 *** | 69,997 |
| Casualties and insurance | 65,741 | | 65,741 |
| Payroll taxes | 59,402 | | 59,402 |
| Depreciation * | 54,697 ** | ( 2,834) 2 *** | 51,863 |
| Food | 47,782 | | 47,782 |
| Taxes | 41,633 | | 41,633 |
| Officers' payroll | 31,200 | | 31,200 |
| Wharfage | 28,540 | | 28,540 |
| Professional fees | 20,195 | | 20,195 |
| Utilities, telephone, and water | 17,335 | | 17,335 |
| Supplies | 13,731 | | 13,731 |
| Auto and truck expenses | 10,979 | | 10,979 |
| Building repairs | 10,404 | | 10,404 |
| Telephone | 10,311 | | 10,311 |
| Other traffic expenses | 10,247 | | 10,247 |
| Advertising | 9,458 | | 9,458 |
| Office expenses | 8,454 | | 8,454 |
| Local transportation | 8,430 | | 8,430 |
| Travel | 7,002 | | 7,002 |
| Public Utilities Commission | 6,000 | | 6,000 |
| Other vessel expense | 5,729 | | 5,729 |
| Miscellaneous | 5,232 | | 5,232 |
| Terminal repairs | 3,585 | | 3,585 |
| Other maintenance and repair | 1,743 | | 1,743 |
| Other terminal expense | 753 | | 753 |
| Total selling, administrative and operating expenses | 1,378,647 | 22,788 | 1,355,859 |
| Net income before income taxes | $ 69,858 | $ 22,788 | $ 92,646 |

\* Note:  Emphasis added.

\*\* The figures for interest and depreciation include the interest and depreciation expenses attributable to the *Nelseco.*

\*\*\* Mr. Goldman included these footnotes to refer readers of his report to the portion in which he comprehensively explained the sources of his downward adjustments to interest and depreciation expenses.  We have not included these explanatory charts in

this series of appendices because the downward adjustment is not relevant to the case before us.